724 F.Supp. 1348 (1989)
The UNITED STATES of America, Plaintiff,
v.
Patrick Lynn MAHER, Defendant.
No. CR89-0056-01J.
United States District Court, D. Wyoming.
November 15, 1989.
*1349 Lisa E. Leschuck, Asst. U.S. Atty., Cheyenne, Wyo., for plaintiff.
Bill McKellar, Cheyenne, Wyo., for defendant.

MEMORANDUM OPINION AND ORDER ON DEFENDANT'S MOTION TO SUPPRESS
ALAN B. JOHNSON, District Judge.
This matter comes before this court on defendant's Motion to Suppress and an evidentiary hearing was held on October 5 and 6, 1989. The significant facts in this case are not in dispute.

FACTS
On Thanksgiving Day, November 24, 1988, Patrick Lynn Maher, was enroute from his home in California to Iowa with *1350 his four children, when he experienced car trouble on Interstate 80 near Lyman, Wyoming. Maher's vehicle was a 1975 Dodge van pulling a homemade flatbed trailer. He arranged for a tow to a motel in Lyman, where he rented a room for the evening.
At approximately 11:40 the next morning, while Maher was working on his van, he was observed by Officer Robert Walser of the Lyman Police Department (hereinafter LPD). Walser testified that, although he saw nothing suspicious about the van or trailer, he ran an NCIC check on both vehicles' license plates. He stated that running random checks on vehicles was part of his normal routine. The license plate attached to Maher's trailer registered an NCIC "hit," which revealed that the license plate belonged to a yellow 1977 Chevrolet Camaro that had been reported stolen in California.
Walser approached Maher, asked for his driver's license, and informed him that the license plate had been reported stolen. Maher stated his driver's license had been stolen, and had no other identification with his picture. Walser checked Maher's name and date of birth and found that he did have a valid California driver's license. He also learned there were no outstanding warrants for him in either California or Wyoming.
Consistent with procedure, Walser called for backup after learning that the trailer's plate registered a "hit." Sgt. Howard Coombs of the LPD and Uinta County Deputy Sheriff Jim Watson were dispatched to the motel for backup assistance. Both officers arrived in marked police vehicles shortly after Walser confronted Maher. When asked if he had any documentation showing ownership of the trailer and van, Maher replied that the bill of sale for the trailer was at his California home, but that he had the van registration in his vehicle. Before Maher entered the vehicle, Sgt. Coombs asked Maher if he had any weapons, and if he could conduct a brief search of the cab of the van to ascertain whether any weapons were there. Maher consented to this limited search, which was conducted and revealed no weapons. Maher also informed the officers that he had an unloaded weapon, and that it was in his motel room, on top of the television set. Walser testified that he asked Maher if he could look in the trailer, to which Maher also consented. After lifting the corner of the tarp covering the trailer, Walser found the trailer loaded with wooden crates. Walser abandoned his search, however, because he had already decided to impound the trailer, where a more detailed search would be performed. At some time during this exchange, Walser made a cursory and unsuccessful search for the trailer's vehicle identification number (hereinafter VIN).
The officers then informed Maher of their intent to seize the pistol from his room, and asked if they could enter the room to get it. Maher again consented. Entering the room, Officer Coombs and Deputy Watson found the unloaded weapon where Maher told them it was located, wrapped in a plastic bag containing a gun clip and some loose ammunition. Coombs took the names and ages of the children in the room, which ranged from 17 to 2 years of age, and informed them that they would be taking Maher to the police station to clear up some things, and that he was not under arrest. Coombs gave the children the LPD phone number and instructed them to call the department or 911 if they needed anything. The pistol was turned over to Walser, who ran a check on it and found it was not reported stolen.
Walser informed Maher that the trailer was going to be impounded. Maher assisted the officers in raising the trailer and moving the van so the tow truck could secure it. Walser testified that Maher was not given an opportunity to provide for the trailer's storage. According to his testimony, at this point in the investigation, Walser could only charge Maher with having an improperly registered trailer. However, because he suspected that the trailer may have been stolen, Walser decided to impound it. He testified that it was the department's policy to impound stolen vehicles or vehicles with stolen license plates attached to them. A copy of LPD's impound *1351 policy was presented to the court as Government's Exhibit 2.[1]
It is unclear at precisely what point Maher was asked to go to the police station, but either soon before or soon after the confiscation of the pistol, Walser asked Maher to accompany him there. Maher testified that he felt he had no choice but to go with Walser, a feeling supported by Walser's testimony that had Maher refused to go with him "voluntarily," he would have arrested him. In any case, Maher was not given an opportunity to drive himself to the police station. Instead, Walser frisked Maher for weapons and placed him in the caged section of his patrol car.
At 1:10 p.m., Walser and Maher arrived at the police station, where Walser read Maher his Miranda rights, asked if he understood, and asked if he wanted to speak with a lawyer. Maher answered that he did understand, but did not wish to speak to an attorney.[2] In an attempt to verify Maher's story about how he obtained the trailer, Walser began making phone calls to law enforcement agencies in the southern California area where Maher resided. Walser continued making these calls until approximately 3:05 p.m. Meanwhile, Officer Coombs and Deputy Watson went to Bridger Valley Motors in Lyman, the private garage where Maher's trailer had been towed and impounded.
The officers removed the tailgate and tarp from the trailer, and noticed that the payload consisted of 20 to 25 wooden boxes. Between 2:30 and 3:00 p.m., Coombs called LPD to tell Walser that he would like to get Maher to sign a consent form before searching the trailer. At about 3:00, after being informed by Walser that a consent form had been obtained, Coombs and Watson, Deputy Sheriffs Paul Arness and George Wolslenben; and Investigator Rex Gaylord and his drug sniffing dog began to search the trailer. The majority of the contents of the trailer were consistent with what Maher had told them, mainly carpet scraps and building materials. There were several boxes containing odds and ends. Watson testified that one box contained what appeared to be military memorabilia. In an envelope in that box, Watson discovered a "reddish-orangish brown" looking substance, which they suspected to be a plastic explosive, and five military mine activators. Also in the box was a coil of military safety fuse. Unsure of exactly what the materials were, the officers discontinued the search and contacted Investigator Ron Noorda, an explosives expert. Noorda separated the explosives from the trailer and the search was eventually completed by the officers.
The request for a written consent was relayed to Walser sometime between 2:30 *1352 and 3:00 p.m. Maher testified that he felt that he had to sign the forms, or that he may be arrested. He was aware at that time that his trailer had been impounded. Investigator Noorda arrived at the police station at approximately 5:00 p.m. and began questioning Maher. Maher's story about obtaining the trailer was consistent with his written statement[3] and the information he had given Walser.
Noorda subsequently conducted tests on the material and discovered the plastic substance to be an explosive material with internal oxidizers that was both heat and shock sensitive. The Bureau of Alcohol, Tobacco and Firearms later informed him that the substance was a solid rocket fuel.
After the search of the trailer was complete, Officer Coombs, Deputy Watson, and Special Investigator Rex Gaylord of the Southwest Drug Enforcement team proceeded to Maher's van to search. Gaylord brought with him a narcotics trained dog, which had also been utilized in the "inventory" of the trailer.[4] The dog alerted on the exterior of the van and the officers searched the interior where they discovered a metal cannister containing a "power-hitter," a known marijuana smoking device, and two small brown vials, identified by the officers as drug paraphernalia. These items were taken to the police station and Maher was confronted with them. At the hearing, Maher explained that none of the paraphernalia had been used in several years, and that he was unaware that it was in the van. The paraphernalia was not tested for traces of any illicit substances, and investigator Gaylord testified that the presence in Maher's van could not have sustained a criminal charge. Although the possession violated a Lyman city ordinance, Walser did not issue a citation for the paraphernalia possession. Instead, after consulting the county attorney, Walser issued Maher a citation for improper registration and allowed him to post a $50 bond. The trailer, however, was never returned to Maher and is still being held at Bridger Valley Motors.
During Maher's stay at the police station, which lasted approximately five hours, he was never formally placed under arrest. He testified that he did not believe he was free to leave, however, and felt that at any time he would be placed under arrest. Walser testified that although never formally under arrest, Maher was not free to leave at any point until the citation issued sometime after 6:00 p.m. Officer Walser testified that he did not, during the almost seven hours of contact with Maher, ever attempt to procure a search or arrest warrant.
On July 20, 1989, Maher was indicted for concealing and storing stolen explosive materials in violation of 18 U.S.C. § 842(h) and § 844(a), and for transporting those same materials in interstate commerce in violation of 18 U.S.C. § 842(a)(3)(A) and § 844(a). On August 25, 1989, Maher filed a motion to suppress the explosives and other items seized during the search of the van and trailer on November 25, 1988. He argues that the impoundment of his trailer and his detention were illegal and improper *1353 seizures, and that any evidence resulting from the searches made subsequent to these events are in violation of the fourth amendment.
On September 22, 1989, Maher filed his proposed findings of fact and conclusions of law, further stating the grounds for his suppression motion.[5]
The issues presented to the court in this case can be characterized as follows: first, whether the oral consent given by Maher in the parking lot was sufficient to justify the later searches of his van and trailer; second, whether the impoundment of Maher's trailer was lawful and whether the inventory was conducted merely as a pretext for investigating suspected criminal activity; and third, whether Maher's detention was permissible. In deciding whether Maher's detention was lawful, the court must determine whether his presence at the police station was voluntary, whether there was probable cause sufficient to justify his arrest, and whether his detention was part of a permissible investigative stop. Finally, the court must decide the effect of the unlawful conduct, if any, on Maher's written consent to search his vehicles.

DISCUSSION
With few exceptions, the fourth amendment protects our right to privacy by prohibiting police from conducting searches without a warrant issued upon probable cause by a detached and neutral magistrate or court. "The security of one's privacy against arbitrary intrusion by the police  which is at the core of the fourth amendment is basic to a free society." Wolf v. Colorado, 338 U.S. 25, 27, 69 S.Ct. 1359, 1361, 93 L.Ed. 1782 (1949). To give effect to the fourth amendment's guarantee against unreasonable searches and seizures, and to deter illegal police conduct, the court must apply the exclusionary rule and suppress any evidence unconstitutionally obtained. Nix v. Williams, 467 U.S. 431, 442-43, 104 S.Ct. 2501, 2508-09, 81 L.Ed.2d 377 (1984); Wong Sun v. United States, 371 U.S. 471, 484, 83 S.Ct. 407, 415-16, 9 L.Ed.2d 441 (1963).
Among the judicially-created exceptions to the warrant requirement are warrantless inventory of a vehicle conducted pursuant to a lawful impoundment, South Dakota v. Opperman, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976) (plurality opinion), and a warrantless search done pursuant to consent, Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The government has the burden of proving by preponderance of the evidence that a warrantless search meets the requirements of an exception to the fourth amendment's warrant requirement, Coolidge v. New Hampshire, 403 U.S. 443, 455, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564 (1971) (plurality opinion) and those exceptions are to be "jealously and carefully drawn." Id.
Initially, the court is not required to rule on the question of whether the search of Maher's room and the seizure of his pistol was unlawful. Although the officers' conduct may have been suspect, and the court finds no merit in the Government's contentions, *1354 the weapon is not evidence of this crime nor is the court asked to suppress it.[6]

Maher's Oral Consent
The Government asks the court to extend Maher's verbal consent to search the cab and look in the trailer to include the search of the trailer after impound. The Government's brief characterizes the consent as follows: "[T]he defendant freely and voluntarily gave his verbal consent to officer Walser to search the van and trailer in the presence of Uinta County Deputy Sheriff Watson. Under the totality of the circumstances, this consent meets the requirements of United States v. Mendenhall." The facts do not support this characterization.
Walser testified that the consent to search the van was given to Coombs at Maher's motel parking lot for the purpose of looking for weapons within the reach of Maher. Coombs's testimony was the same. After Coombs had asked Maher, Walser then inquired whether he, too, could look in Maher's trailer. Walser indeed only looked under the trailer's tarp, then abandoned his search having already decided to impound. The court finds that Maher voluntarily consented to scan the van cab for weapons and to Walser's cursory look into the trailer. The court will not, however, extend this consent to the second search of the trailer.
The question presented by the Government's contention is not merely whether Maher's consent was voluntarily and freely given, but also whether the subsequent "inventory" of the trailer and search of the van were outside the scope of the original verbal consent. It is well established that the scope of a search based on consent is limited by "the breadth of the actual consent itself." United States v. Gay, 774 F.2d 368, 377 (10th Cir.1985). Whether the scope of consent has been exceeded is a factual question and should be determined based on the totality of the circumstances. United States v. Espinosa, 782 F.2d 888, 892 (10th Cir.1986). "Except in unusual circumstances, it would seem that a consent to search may be said to be given upon the understanding that the search will be *1355 conducted forthwith and that only a single search will be made." 3 La Fave, Search and Seizure, § 8.1(c), at 170 (2d ed. 1987). The Government contends that the scope of Maher's consent in the parking lot independently validates the subsequent search.
With regard to the van, all witnesses agree that the purpose of the search was narrowly drawn and explained to Maher and it was to that which he consented. Coombs testified that the search was merely a scan for weapons in the cab of the van, because Maher was getting into the front passenger side.
After Coombs asked to search, Walser inquired about the trailer. When asked what he said, Walser testified: "Well, I'd like to search your trailer also, and he said yes." Walser later phrased it: "I came in and said that I'd like to search the trailer also and he said yes, go ahead." The testimony of Maher differed slightly.
Q. Did Officer Walser say anything to you?
A. In regard to what?
Q. Searching the trailer.
A. He asked if I mind [sic] if he looked under the tarp real quick [sic].
Q. Okay, and what did you tell him?
A. And I gave him permission.
To attribute to any of these statements a knowing and voluntary consent to search for several hours following would be absurd in light of the surrounding facts. The officers' acts support this conclusion. Realizing that an extensive search would be required, Coombs requested that Walser obtain a written consent. The evidence presented at the hearing indicated that neither officer believed the verbal consent encompassed the subsequent search, and thus requested that Maher execute a written consent. There was no evidence that Maher gave an ongoing consent to the officers to search his van and trailer and then to search it again after impound. (The written consent form will be discussed later.) The court concludes that the verbal consent given by Maher was not broad enough to include the subsequent "inventory" or van searches.
Further, under the totality of the circumstances, Maher's verbal consent to the initial search of his van and trailer was vitiated prior to the search of the trailer. To find differently, the court must view all events and intervening circumstances  the events in the parking lot, impoundment of Maher's trailer, the extended stay at the police department, the seizure of Maher's weapon, the amount of time and separation from his vehicle between consent and search  and determine that none of these vitiated the consent given by Maher.
In United States v. Leary, 846 F.2d 592 (10th Cir.1988), the Court held that:
When a government agent claims authority to search under a warrant, "he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion  albeit colorably lawful coercion. Where there is coercion there cannot be consent." Bumper v. North Carolina, 391 U.S. 543, 550, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968).
Leary, 846 F.2d at 598.
Although this analysis has been applied mainly in cases where search warrants have been procured, it has equal force here.[7] The presentation to a person by a government authority that he, in effect, cannot resist a search or seizure, is undoubtedly a display of coercion. In this case, Walser announced to Maher that the trailer would be impounded, and it subsequently was. He did not allow Maher to make arrangements for its storage, but took official police custody of it. It is not clear whether Maher was told that his trailer would be inventoried.
*1356 This court will not apply this reasoning to per se invalidate a search in every such instance, see id. at 598 n. 9, but will instead consider this type of "lawful coercion" in the totality of the circumstances. Indeed, it would be improper for this court to apply such a per se analysis to this case, because there was no evidence presented that Maher knew of or did not know of the imminent "inventory" of his trailer. Notwithstanding the legality of the impoundment of Maher's trailer or his written consent, however, the court finds that under the totality of the circumstances the "parking lot consent" was vitiated by the subsequent events and cannot be construed to validate the later search.

Inventory of Maher's Trailer
The Government contends that the search of the trailer was pursuant to the police department's written inventory procedure to be followed after a vehicle is impounded. The circumstances justifying the impound are listed by the Government as follows:
... [T]he defendant was unable to produce documentation to support his statement that he bought the trailer.... The defendant was then unable to establish registration or any proof of ownership.... The trailer ... could be damaged by a third-party. Finally, Officer Walser had an NCIC "hit" on the license plate indicating the license plate was registered to a stolen vehicle.
An inventory search will be upheld when it is reasonable under the fourth amendment in light of the facts and circumstances of a particular case. A threshold inquiry in determining whether an inventory search is allowed under the fourth amendment is whether the search is incident to a lawful impoundment. United States v. Brown, 787 F.2d 929 (4th Cir. 1986) (an inventory search is only valid when the vehicle is validly in custody of law enforcement officers); United States v. Staller, 616 F.2d 1284, 1289 (5th Cir. 1980) ("obviously, before the need to protect these [Opperman] interests can arise, the police must have the right to take custody of the vehicle"); United States v. Abbott, 584 F.Supp. 442, 447 (W.D.Penn.) aff'd, 749 F.2d 28 (3d Cir.1984); United States v. Nelson, 511 F.Supp. 77, 81 (W.D. Tex.1980). The Tenth Circuit has reasoned consistently in United States v. Pappas, 735 F.2d 1232 (10th Cir.1984), finding an impoundment and inventory search improper where there was no need to impound the car. "... Opperman cannot be used to justify the automatic inventory of every car upon the arrest of its owner." Id. at 1234. Likewise, it cannot be used to justify an inventory of a vehicle unless the police acted reasonably and pursuant to the fourth amendment when impounding it.
Officer Walser testified that he had authority to impound Maher's vehicle pursuant to Lyman Police Department procedure. That procedure allows for impound in six circumstances. See n. 1. It is not apparent from the testimony whether Walser acted under subsection (a)(3), providing for impound if the vehicle can be used as evidence of the commission of a crime, (a)(4), providing for impoundment where a vehicle is in violation of state law, or (a)(5), providing for impound when a stolen vehicle is recovered. The seizure of the vehicle, however, cannot be reasonably justified under any of these criteria.
The trailer was not evidence of the commission of a crime. At most, there was a suspicion that the trailer may have been stolen. The fact that Maher could not produce ownership documents would certainly not give rise to probable cause to believe the trailer was stolen. The officers testified that the trailer was not a 1977 Camaro, was not made from a 1977 Camaro, nor was it carrying a 1977 Camaro. All evidence suggested that the Officer's idea that the trailer may have been stolen was nothing more than unfounded suspicion.[8] *1357 The court does not find impound based on this to be reasonable. In Colorado v. Bertine, 479 U.S. 367, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987), the Supreme Court emphasized that the police have some discretion in impounding vehicles. "Nothing in Opperman or Lafayette prohibits the exercise of police discretion [to impound a vehicle] so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity." 479 U.S. at 375, 107 S.Ct. at 743.
Maher concedes that his vehicle was improperly registered. Adhering to the letter of the LPD policy, Walser would be justified in impounding any vehicle found in violation of state law. The logical extension of this justification is, of course, absurd. It would allow an officer to impound a vehicle for any minor violation whatever, and would certainly not be the type of discretion "exercised according to standard criteria" discussed in Bertine. This standard is an open invitation for pretextual searches justified as inventories. The lawfulness of an inventory search depends first on whether the impoundment was prompted by "some reasonable necessity." State v. McDaniel, 156 N.J.Super. 347, 383 A.2d 1174, 1179 (1978). This court has recently cited the reasoning in McDaniel favorably.[9]
The common theme underlying these cases and others is that something more must be shown to justify impoundment of a car than it would otherwise be left unattended. There must be a showing that some reasonable necessity prompted the impoundment. This is a salutary rule, for otherwise police would be authorized to freely stop a car for a minor traffic infraction, impound it and search it with impunity. Surely such a circumstance is not consonant with the fourth amendment.
Id. Several factors have been used to analyze the reasonableness of impounding a vehicle. These include whether the defendant was traveling alone in a moving vehicle, whether the person is alone or has someone else to take custody of the vehicle, whether the impoundment is necessary to protect the vehicle or its contents from loss or damage, whether the seizure would be a major or minor intrusion on the person involved, and whether the person is expected to be away from the vehicle for an extended period of time. See United States v. Nelson, 511 F.Supp. at 81. The presence or absence of any of these factors will not, of course, be dispositive. Instead, they are to be evaluated to decide whether the officer acted reasonably in impounding the vehicle. The trial court's inquiry is not whether a more reasonable path could have been traveled, Bertine, 479 U.S. at 374, 107 S.Ct. at 742-43, Illinois v. Lafayette, 462 U.S. 640, 647, 103 S.Ct. 2605, 2610, 77 L.Ed.2d 65 (1983), but whether the actions were reasonable in light of the circumstances.
Based on the facts, the court finds the officers' actions in impounding the vehicle patently unreasonable. Maher was traveling with four children, one of whom was 17. The officers did not inquire whether she could take custody of or watch the trailer, although they were aware that she was going to stay at the motel until Maher returned. The officer knew there were no outstanding warrants for Maher. The Government's argument that the impound was for the protection of the trailer's contents cannot be supported by the surrounding facts. It was the middle of the day; Maher was not under arrest or expected to be away from his vehicle for a long period of time, the van and trailer were lawfully parked on private property; and there were persons to look after it. Although the same reasoning would apply to impounding Maher's van, it was not impounded. *1358 More important, the officers violated the department impound policy, their own standard criteria, by failing to provide Maher with an an opportunity to secure the trailer. See n. 1.
The court further finds that the impound of the trailer was merely a pretext for conducting a thorough investigatory search in the hope of discovering evidence of a crime. The court is convinced that the police were not "engaged in a caretaking search of a lawfully impounded" vehicle, but that their action "was a pretext concealing an investigatory police motive." Opperman, 428 U.S. at 375-76, 96 S.Ct. at 3100. An inventory search will not be upheld when it is used merely as a pretext for an investigatory search. See, e.g., United States v. Kornegay, 885 F.2d 713 (10th Cir.1989) (upholding inventory search not motivated by police suspicion of criminal activity); United States v. Pappas, 735 F.2d 1232 (10th Cir.1984); United States v. Johnson, 815 F.2d 309 (5th Cir.1987); United States v. Feldman, 788 F.2d 544 (9th Cir.1986); United States v. Whitfield, 629 F.2d 136 (D.C.Cir.1980). Lacking probable cause, the officers nonetheless impounded Maher's trailer for a relatively minor registration violation.[10] The search was conducted by five officers, excluding Investigator Noorda. Although Officers Walser and Coombs denied any investigative motive, Investigator Gaylord and his drug-sniffing dog, were dispatched to the impound garage either while the trailer was enroute, or as soon as it had arrived. According to their own records, the officers planned to search Maher's van more than one and one-half hours before asking his consent, and in the search of the trailer the officers were looking for "crack" because "that area is known for crack." In furtherance of the investigation, names were taken off some of the crates so that Walser could have them checked as well.
Notwithstanding these facts, the Government asserts that the search was conducted to protect Maher's trailer from damage by some third-party. This assertion "smacks of pure unadulterated pretext." United States v. Bonitz, 826 F.2d 954 (10th Cir.1987). Instead, the scene recreated for the court was nothing more than a "fishing expedition." The evidence gives a plain picture of Maher, confronted by three police officers and subjected to two cursory searches, then taken to the LPD where his story was checked for over five hours, while no fewer than six police officers, at least one called from off-duty, searched through all of his personal belongings. Upon finding anything suspicious, an officer would parade it in front of Maher and subject him to further interrogation. The fourth amendment will not tolerate this magnitude of police intrusion based on nothing more than suspicion of a crime or the suspicious appearance of a person.

Maher's Detention at the Police Station
The Government next argues that Maher's stay at the police station was legal for any of three reasons. First, the Government's brief suggests that Walser had probable cause to arrest Maher at any time after he received the "hit" on the license plate. Second, the Government argues that Maher's presence at the police station was of his own free will. Finally, it suggests that even if the officer lacked probable cause, he had a duty and a right to detain Maher for an extended period of time to investigate a "possible felony and ascertain the facts surrounding" it. The Government contends that if the detention was legal, the court must accept the freely and voluntarily given consent signed by Maher.

A. Did the Officers have Probable Cause to Believe a Felony had been Committed by Maher?
As the Government points out, a peace officer in Wyoming is authorized by statute to:

*1359 (a) ... arrest a person without a warrant and detain that person until a legal warrant can be obtained when:
. . . . .
(ii) he has probable cause to believe that a felony has been committed and that the person to be arrested has committed it; ...
Wyo.Stat. § 7-2-103 (1977). The NCIC "hit" which Walser received was for a 1977 Camaro. As previously noted, the automobile was not in Maher's possession. In fact, the only stolen item in Maher's possession was a license plate, which under both Wyo. Stat. § 6-3-402(c)(ii) and § 6-3-403(a)(iii) is plainly a misdemeanor.[11] Thus, although Walser was justified in investigating the crimes cited by the Government, the facts were such that a reasonable officer would not have concluded there was probable cause to believe a felony had been committed by Maher. In fact, Walser knew soon after their encounter there were no outstanding warrants for Maher in California or Wyoming. The Government cites United States v. Roper, 702 F.2d 984 (11th Cir.1983), for the proposition that probable cause to arrest existed. If anything, this case supports the opposite proposition. In Roper, an officer conducted an investigative stop of a vehicle because one of the car's occupants was described on a bond flyer. After the officer had conducted an NCIC check revealing there was an outstanding warrant for the defendant's arrest, the court found that the officer had probable cause for his arrest. Wyoming law provides, as one precondition for arrest, that a peace officer
(ii) ... has reasonable grounds for believing that a warrant for the person's arrest has been issued in this state or in another jurisdiction.
Wyo.Stat. § 7-2-102 (1977). Officer Walser was aware that just the opposite was true.

B. Was Maher's Presence at the Station Voluntary?
The Government contends that, even absent probable cause to arrest, Maher's detention at the police station did not taint his written consent to search because he voluntarily accompanied Walser to the station and remained there voluntarily. The Government has the burden of proving that Maher freely and voluntarily consented to go to the station. United States v. Recalde, 761 F.2d 1448 (10th Cir.1985). "Whether the consent is in fact voluntary, or is the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all these circumstances." Id. at 1453.
In Recalde, the Tenth Circuit addressed a case with strikingly similar facts. An officer had stopped Recalde for speeding outside Moriarty, New Mexico, and having a "gut instinct" that he was transporting narcotics, called for a backup officer. The officer gave Recalde a ticket with the option of signing it and paying the fine. Recalde was not the owner of the vehicle he was driving, and could not produce proof that he was driving it with the owner's consent, nor could he produce the owner's phone number.
The officers asked to look in Recalde's trunk, and he gave permission. Nothing suspicious was discovered. He was asked to accompany the police into Moriarty, while the officer kept the speeding ticket, his driver's license, and the automobile registration. At no point was he told that he was free to leave, or that he could refuse to follow them into the station. Once at the station, Recalde was read his Miranda *1360 rights and executed a consent to search form. His car was then dismantled, revealing a large amount of narcotics.
In holding that Recalde's consent to be taken to town was not voluntary in fact, the court considered significant the following facts: that he was asked to go to town in the presence of two uniformed officers; that his car had already been searched; that the officer held Recalde's license and registration; that he had not yet received a citation; that he was never told he was free to go; and that the officer testified that he would not have allowed Recalde to leave in his car. Each of these factors is present in this case. Beyond these, Maher's trailer, which contained a great deal of his personal effects, was seized. Additionally, Maher was worried about his children and felt that he had no choice but to cooperate or he would be arrested and unable to further care for them. As the court in Recalde noted:
Whether he was asked or not, Recalde was confronted with a coercive custodial situation in which he had no real choice but to comply. Accordingly, we hold that Recalde did not consent to be taken to the station house in Moriarty.
761 F.2d at 1454.
The facts confronting the court in United States v. Gonzalez, 763 F.2d 1127 (10th Cir.1985) are telling. There, while retaining the defendant's driver's license, registration, and vehicle title, a police officer "asked" Gonzalez to follow him to the police station. The court viewed this situation as giving the defendant "no reasonable choice other than to accompany the officer no matter how polite the officer was in phrasing his request." Id. at 1132. The court finds that Maher was given no reasonable choice but to accompany Walser to the police station.
Maher testified that he did not feel free to leave, and Walser testified that, although he did not so inform him, Maher was not in fact free to go. There is no special magic in the phrase "you are under arrest," such that its absence will transform a situation replete with the indicia of a traditional arrest into anything less coercive. To find that this situation was free of any duress or coercion would fly in the face of the evidence.

C. Were the Officers' Actions Justified as an Investigatory Detention?
The Government contends that Walser's detention of Maher was justified as an investigative Terry-type detention under United States v. Sharpe, 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). Under Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the police may make limited intrusions on an individual's security when they have a reasonable, articulable suspicion that such an individual has been, or is about to engage in criminal activity. Recalde, 761 F.2d at 454. In determining the reasonableness of an investigative seizure under Terry the Court in Sharpe held that the length of a stop must be reasonable under the circumstances. They refused to apply a per se time limit for an acceptable Terry stop, holding that the proper inquiry is "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." Sharpe, 470 U.S. at 687, 105 S.Ct. at 1576.
While it is beyond doubt that Maher was detained for a patently unreasonable length of time under Sharpe,[12] the case is *1361 more properly resolved by the Court's analysis in Hayes v. Florida, 470 U.S. 811, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985). In Hayes, the defendant was confronted on his front porch by policemen and asked to go to the police station. When he expressed reluctance, an officer told him they would arrest him. He then "consented" to accompany them to the station. The decision in Hayes was not based on an unreasonable length of time of detention, but on the reasonableness of the detaining officer's conduct. The court found that none of its decisions applying Terry
have sustained against fourth amendment challenge the involuntary removal of a suspect from his home to a police station and his detention there for investigative purposes, whether for interrogation or fingerprinting, absent probable cause or judicial authorization.
Id. at 815, 105 S.Ct. at 1646. The Tenth Circuit applied Hayes to a situation where an "officer had defendant's driver's license, car registration, and title at the time he `asked defendant to follow him to the station.'" Gonzalez, 763 F.2d at 1132. The court held that when a defendant has no reasonable choice but to comply with an officer's request, the conduct is as coercive as the threat made to the defendant in Hayes. As this court has already found, Maher's detention was involuntary in fact. The Court in Hayes capsulized the applicable standard:
There is no doubt that at some point in the investigative process, police procedures can qualitatively and quantitatively be so intrusive with respect to a suspect's freedom of movement and privacy interests as to trigger the full protection of the fourth and fourteenth amendments. Dunaway [v. New York], supra, 442 U.S. [200] at 212, 99 S.Ct. [2248] at 2256 [60 L.Ed.2d 824 (1979)]; Florida v. Royer, 460 U.S. 491, 499, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983) (plurality opinion). And our view continues to be that the line is crossed when the police, without probable cause or a warrant, forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes. We adhere to the view that such seizures, at least where not under judicial supervision, are sufficiently like arrests to invoke the traditional rule that arrests may constitutionally be made only on probable cause.
Id. 470 U.S. at 815-16, 105 S.Ct. at 1646-47. This court concludes, as in Recalde, that the officers seized and transported Maher to the station and detained him involuntarily, in an atmosphere "indistinguishable from a traditional arrest." The fourth amendment prohibits this type of intrusion without judicial supervision or, at a minimum, probable cause.
The court must finally decide what effect Maher's detention had on his subsequent written consent to search his van and trailer. It is possible that a consent may remove the taint of an illegal detention, if it is sufficiently attenuated from the illegal act. Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The consent must be "sufficiently an act of free will to purge the primary taint." Id. at 486, 83 S.Ct. at 416. In Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 *1362 L.Ed.2d 416 (1975), the Court listed several factors a court should apply to determine "whether the confession is obtained by exploitation of an illegal arrest." These include "[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, ... and, particularly, the purpose and flagrancy of the official misconduct.... And the burden of showing admissibility rests, of course, on the prosecution." Id. at 603-04, 95 S.Ct. at 2261-62. In fact, the Government's burden is much heavier when trying to establish a voluntary and freely given consent after an illegal detention. Recalde, 761 F.2d at 1457. The Tenth Circuit applied the three factors articulated in Brown to a situation where a consent to search was obtained after an illegal arrest. United States v. Maez, 872 F.2d 1444 (10th Cir.1989).
Here, the Government has not met its burden. First, when Maher executed his consent, both he and his trailer were being unlawfully detained. There was no evidence of intervening circumstances purging the primary taint. Maher was in the company of police officers from the time of his seizure to the time he executed the consent form, and was being interrogated much of that time. The officer did nothing that would break the causal chain between the seizures and the consent, and the Government presented no evidence that the consent was the result of anything other than an exploitation of Maher's unlawful detention and the unlawful holding of his trailer. Indeed, the evidence indicated that this was precisely what occurred. Finally, the police conduct causing the taint, which was ongoing at the time of the consent, must be evaluated. The court has found that the purpose of the police misconduct was to thoroughly search Maher's vehicles for evidence that a crime, other than the potential that the trailer was stolen, had been committed, and that this purpose was achieved through their course of conduct. Under Brown, the court finds that the consent was the fruit of an illegal detention.
Nor will the reading of Miranda rights purge the taint of the illegal detention. While it is certainly a factor to be considered in determining the voluntariness of his consent, the court is mindful that this is merely a threshold requirement to the "causal connection" test in Brown. The government must show that some intervening events broke the causal chain between illegal detention and consent. Dunaway v. New York, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). To hold otherwise would be to allow "law enforcement officers to violate the fourth amendment with impunity, safe in the knowledge that they could wash their hands in the `procedural safeguards' of the fifth." Id. at 219, 99 S.Ct. at 2260. The Government does not fulfill its burden with regard to Maher's detention, and, further, there is no reason to assume that the reading of Miranda rights would, in any event, purge the taint of the illegal seizure of the trailer.

CONCLUSION
The Government has failed to prove that the searches conducted by the Lyman Police Department fit within one of the exceptions to the fourth amendment's warrant requirement. The scope of Maher's oral consent did not encompass the later searches, and even if it had, it was vitiated by the events that occurred subsequently. The impounding of Maher's trailer was an unlawful seizure, clearly unreasonable under the circumstances and not in compliance with standard procedure. Further, the impound was conducted pretextually with a substantially investigative motive. In light of the facts, the officer lacked probable cause to arrest Maher, and his detention at the police station was in fact involuntary. His detention exceeded the bounds of a permissible investigation detention. Finally, no events occurred that could have purged the taint of the improper police conduct.
Finding the actions of the police officers violated the fourth amendment, the court holds that the search of Maher's trailer and van and Maher's detention, without judicial supervision or probable cause, were constitutionally impermissible and the fruits must be suppressed.
*1363 IT IS THEREFORE ORDERED that the defendant's motion to suppress be GRANTED.
NOTES
[1] The Lyman impound policy reads in pertinent part:

1. When to impound:
a. Vehicles are impounded for the following purposes only:
1. When a vehicle constitutes a traffic hazard.
2. When the drive [sic] or owner is injured, dead, or arrested and cannot personally care for the vehicle or have some responsible person take custody of it for him.
3. As evidence of the commission of a crime.
4. When a vehicle is in violation of the state of Wyoming laws.
5. When a stolen vehicle is recovered.
6. When a vehicle is abandoned for more than 24 hours on a city street and all reasonable efforts [sic] to contact the owner or other responsible party fails.
b. Vehicles [sic] impounds are never to be used as a punitive measure or to get even with a violator. If the owner can make arrangements within a reasonable length of time to secure the vehicle, the officer must allow him to do so.
[2] Maher contends that at one point in the investigation, he asked Walser what would happen if he asked for an attorney to just sit and listen to the questioning. He claims that Walser became upset and told him that it would mean the police would have to "wrap him up" until the Monday after the holiday weekend. This was presumably the earliest time an attorney could be obtained. Maher contends that Walser also said he would have to give custody of Maher's children to D-PASS (Department of Public Assistance and Social Services) until after the weekend in the event that Maher was held. On rebuttal, Walser denied that any of this occurred.

No explicit argument was made by defendant's counsel that Maher's failed request required that he be provided counsel or that the questioning should have ended. The evidence was instead elicited to bolster the totality of the circumstances surrounding Maher's consent.
[3] Maher's handwritten statement, submitted to the court as Government's Exhibit 6, reads in its entirety:

I, Patrick Lynn Maher, state that I reside at 4094 Wallace Riverside CA. I Patrick Maher purchased a brown trailer from a man by the name of Tommy. Tommy was introduced to me by a man who lives around the corner from me. The man's name was Frank Burdoff. Tommy offered to sell me the trailer for $500 repaired or $300 damaged. I bought the trailer damage [sic] with tailgate broken off and fender broken off. I welded the fender on and hung and tied the tailgate on after it was loaded. There was an apparent stolen plate on the tailgate. The plate was on the tailgate at the time of purchase.
[4] Although the officers denied any investigative motive behind the impoundment, beyond verification of ownership, the records indicate that Gaylord and his narcotics-sniffing dog were requested to search as early as 1:33 p.m. This was at virtually the same time as the impound, and nearly an hour and a half before Maher executed the consent form. Further, the phone log comments include a notation that the dog cannot detect "crack," and that "that area," presumably the area from which Maher came, is known for crack. Finally, the records show that the officers had decided to search Maher's van before the discovery of explosives, and before getting Maher's written consent.
[5] The briefs submitted to the court state the issues differently. Maher argues first that under the circumstances, accompanying Walser to the LPD was not voluntary. Second, he contends that his detention was an unlawful seizure of his person exceeding the constitutional limits of an "investigative stop." Finally, he argues that the consent he signed at the police station is the product of an illegal arrest and seizure and therefore must be suppressed. In his brief, Maher does not contest the legality of the search of his van's cab for weapons, or Walser's look under the tarp of the trailer in the parking lot. Both were pursuant to oral consent which Maher admits. At the hearing, Maher did, however, challenge the voluntariness of that consent based on the totality of the circumstances.

The Government contends first that Officer Walser had probable cause to arrest Maher, and was justified in detaining him for the purpose of investigating a possible felony. Second, the Government argues that the oral consent given by Maher was sufficient to justify a search of his van and trailer, and that the later written consent was also sufficiently free of coercion or threat as to be effective. Third, the Government justifies the search on the basis of a lawful impoundment and inventory of Maher's trailer. Finally, it is argued that the seizure of the pistol from Maher's motel room was justified pursuant to Wyoming statute and the "plain view" exception to the warrant requirement.
The substance of all of the parties' issues is addressed in the opinion.
[6] Maher does contend that the search of his room and seizure of his pistol were illegal. The analysis is not used to suppress the pistol as evidence (for it must be admitted that the weapon is not, and will not be, used as evidence of the commission of the crime for which Maher is charged), but to add to the totality of the circumstances in determining the voluntariness of Maher's detention at the police station.

Although Maher apparently agreed to let the two officers into his room, he argues that any consent is vitiated by the circumstances. Two armed officers accompanied him to the room, he had already admitted to having the pistol, and the officer had told him they were going to seize it.
The Government argues in its brief that, while checking on the welfare of Maher's children, "the officers inadvertently saw a .32 caliber pistol lying in plain view in the motel room." At best, this mischaracterizes the events. All the officers who testified noted that Maher informed them of the weapon and its exact location while still in the parking lot. From their testimony, the court may infer that a significant impetus in accompanying Maher to his motel room was retrieval of the weapon. Indeed, the officer's testimony indicates just that. It is well settled that:
An integral part of the established [plain view] rule is that "the officer must discover incriminating evidence `inadvertently' which is to say, he may not `know in advance the location of [certain] evidence and intend to seize it,' relying on the plain view doctrine only as a pretext."
United States v. Guzman, 864 F.2d 1512, 1517 n. 4 (10th Cir.1988) (quoting Texas v. Brown, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) (plurality opinion); Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) (plurality opinion)). All evidence presented suggests that just the opposite occurred here. In addition, evidence was presented that the gun was wrapped in a plastic bag making it difficult to see precisely what it was. Even without making a factual finding on that point, it would stretch logic to apply the plain view exception to this situation.
The court was presented with no indication of why the pistol was seized in this particular situation. It appears to be a properly registered and owned weapon which is not evidence of the crime involved. In fact, Wyo.Stat. § 7-2-104 only authorizes the seizing of a deadly weapon in the possession of a person who is arrested. Even then, the seizure is allowed only when the officer has reason to believe it will endanger the public or officer's safety, or be used to resist arrest or escape it. Although there are several reservations concerning the seizure, it is not necessary for the court to decide the legality of the police action in seizing the weapon in order to analyze the totality of the circumstances, given the conclusions which follow.
[7] In fact, the court finds no instance where the lawful coercion claimed was threat of impoundment and inventory search. The totality of the circumstances test, however, demands that the coercive nature of these events be considered. The court finds no difference between a scenario where a police officer states his authority to search pursuant to warrant, and when the authority is based on a different premise (here inventory) that is nonetheless "colorably lawful." This court does not, however, find that the conduct per se vitiated Maher's consent, only that it must be considered in the totality of the circumstances.
[8] At trial, Officers Walser and Coombs both testified to the absence of a vehicle identification number on the trailer. This, the Government contends, also heightened their suspicion of foul play. Although it was conceded that VINs are often absent on homemade-type trailers, and that it is not suspicious for a VIN to be absent from such a trailer, both officers testified that the trailer did not appear homemade to them, but rather a commercial-type. On the citation issued to Maher, however, the make of the trailer listed by Walser is "homemade" and, independently, the make of the trailer noted by a different officer on the inventory sheet is "homemade." The court finds no evidence that a reasonable police officer would have found this absence suspicious.
[9] See, United States v. Ibarra, No. CR89-0025, ___ F.Supp. ___ slip op. (D.C.Wyo. Nov. 1989).
[10] It is beyond question that the police officers had an absolute right to seize the license plate from Maher's trailer. They also were correct in telling Maher that the vehicle could not be moved until proper registration was acquired. The trailer itself, however, was the subject of no more than a violation of Lyman town ordinance, requiring a $50 appearance bond.
[11] The court takes judicial notice of Wyo.Stat. § 7-2-103, which provides for arrest in some instances where a misdemeanor has occurred. The statute provides in relevant part, that a peace officer may arrest without a warrant when:

(iii) He has probable cause to believe that a misdemeanor has been committed, that the person to be arrested has committed it, and that the person, unless immediately arrested:
(A) Will not be apprehended;
(B) May cause injury to himself or others or damage to property; or
(C) May destroy or conceal evidence of the commission of the misdemeanor.
The Government does not argue that this provision is applicable, presumably because all of the officers' testimony indicates that Maher met none of the three criteria.
[12] The court is not required to make a finding that the detention was an unreasonable length of time due to the application of Hayes. It is obvious, however, that an analysis under Sharpe would produce the same result. Sharpe concerned a traffic stop of two vehicles for suspected drug trafficking. One of the vehicles was detained 20 minutes while a DEA agent was enroute. The Fourth Circuit found that the detention failed to meet the brevity requirement of an investigative stop. While the Supreme Court held that there is no rigid time limitation on Terry stops, the court reiterated the balancing test employed in United States v. Place, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). The invasion of a person's fourth amendment rights must be minimally intrusive when probable cause is lacking, and an important factor in determining whether this is achieved is the brevity requirement. The police are allowed a reasonable time to effectuate their investigation on the other side of the scale. This court finds no instance where a detention of over five hours was found reasonable. Indeed, the 20 minutes spent in Sharpe was long enough to require a careful balancing of the interests. There is no reason why, during the time of the investigation, it was necessary to detain Maher. No evidence was ever presented to this effect. This is a requirement under Terry.

Finally, Sharpe notes significantly that when an investigative detention has continued long enough, to the point of being de facto arrest, diligent pursuit of the investigation will no longer suffice to allow the detention. As the court stated:
Admittedly, Terry, Dunaway, Royer, and Place, considered together, may in some instances create difficult line-drawing problems in distinguishing an investigative stop from a de facto arrest. Obviously, if an investigative stop continues indefinitely, at some point it can no longer be justified as an investigative stop.
Id. 470 U.S. at 685, 105 S.Ct. at 1575. That line has plainly been crossed. To hold that a detention of over five hours without judicial oversight or a warrant was nonetheless justified as a Terry stop, would go far beyond any holding yet espoused by the Court.