**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Miguel Angel RECALDE,**
**Defendant-Appellant.**

**No. 84–1698.**

United States Court of Appeals,
Tenth Circuit.

May 10, 1985.

McWilliams, J., dissented.

Hank Farrah, Albuquerque, N.M., for defendant-appellant.

David N. Williams, Asst. U.S. Atty., Albuquerque, N.M. (William L. Lutz, U.S. Atty., and Don J. Svet, First Asst. U.S. Atty., Albuquerque, N.M., with him on the brief), for plaintiff-appellee.

Before SEYMOUR, McWILLIAMS and WINDER,[*] Circuit Judges.

SEYMOUR, Circuit Judge.

Miguel Recalde was convicted on one count of possession with intent to distribute cocaine under 21 U.S.C. § 841(a)(1) (1982). On appeal, he argues that the district court erred in denying his motion to suppress evidence seized during a search of his automobile. We agree and reverse his conviction.

## I.

Recalde is an Argentinian citizen and a resident alien of the United States. On October 20, 1983, while driving westbound on Interstate 40, he was stopped near Moriarty, New Mexico, by Officer Thomas Christian of the New Mexico State Police, who had observed Recalde's vehicle speeding. Recalde was traveling alone and the stop occurred shortly after noon, approximately five miles west of Moriarty, during a rainstorm.

At Christian's request Recalde produced a Virginia driver's license in his name and a Virginia automobile registration listing as the owner one Roberto Sosa. Christian told Recalde he was going to issue him a speeding ticket and returned to his police cruiser to conduct a National Crime Information Center (NCIC) check, via his car radio, on the status of Recalde's car. The NCIC check was negative. At this time Christian also used his radio to contact Officer Jerome Armijo of the Moriarty Police Department. Christian testified he had "a gut instinct" that Recalde "was transporting narcotics." Rec., vol. II, at 15.[1] Christian told Armijo about his suspicion and requested that Armijo proceed to the scene to assist him.

While waiting for Armijo, Christian told Recalde he either could appear in traffic court or could plead guilty by signing the ticket and paying a fine. Recalde said he would pay the fine and he signed the ticket. Christian requested that Recalde step out of his car and asked if he knew the car owner's telephone number. Recalde replied that he did not. When asked how he would contact the owner if something happened to the car, Recalde did not respond. At some point Recalde told Christian he was from Argentina, showed him his resident alien green card,[2] and said he was a car salesman on his way to Los Angeles. During this questioning Armijo arrived on the scene.

Christian then asked Recalde if he could look in the car's trunk and Recalde gave his permission. Christian found one suitcase which Recalde opened, revealing some casual clothes. Recalde also opened a

[1]. At the suppression hearing, under questioning by defense counsel, Christian testified:

"A. I ... called another officer to come up and assist me.
Q. Why did you do that?
A. Because I felt that the vehicle was transporting narcotics.
Q. Why did you feel that way?
A. Gut instinct.
Q. Gut instinct?

A. I've been a policeman for five years. I know when something is not right.
Q. What was wrong with this situation?
A. I don't know."
Rec., vol. II, at 15.

[2]. Christian testified at the suppression hearing that he wasn't completely sure whether he saw Recalde's green card until sometime later, but that he nonetheless "could see proof that he [Recalde] was [an alien]." Rec., vol. II, at 16–17.

briefcase stored in the trunk. At the suppression hearing, Christian admitted that he found nothing suspicious in Recalde's luggage. He testified, however, that during the roadside stop he did notice that a number of screws in the automobile's interior molding showed signs of having been scratched or tampered with.

At this point, the testimony of the parties diverges. Recalde testified that he was told he would have to accompany the officers to Moriarty. Christian and Armijo both testified that Recalde was asked if he would follow them into Moriarty and that Recalde agreed. However, neither officer disputes that Recalde was not told he was free to proceed on his way or that he could refuse to follow them into Moriarty. It is also undisputed that Christian kept possession of the speeding ticket, Recalde's driver's license, and the automobile registration throughout the roadside encounter and during the trip into Moriarty.

Recalde and the officers then proceeded back five miles to Moriarty, with Recalde's car sandwiched between Christian's and Armijo's police cruisers. When they arrived at the state police office in Moriarty, it was locked and no one else was present. Christian and Armijo took Recalde into a small room inside the station, where Christian gave Recalde *Miranda* warnings. In response to several questions by Christian, Recalde replied that he did not want to answer any questions but that the officers could search the car if they wanted to. Christian, who still had possession of the ticket, Recalde's driver's license, and the automobile registration, told Recalde he wanted to search the car and handed him a consent-to-search form, which he executed.

Recalde's car was taken to a nearby gas station where it was dismantled. Christian, aided by several narcotics agents, searched the car and discovered ten kilo-

grams of cocaine stored inside the car's interior quarter panels. Christian then placed Recalde under arrest.

Recalde was indicted for possession of cocaine with intent to distribute. At a pretrial suppression hearing, he challenged the voluntariness of his consent to the search of the car at the station. He sought to have the cocaine suppressed as the fruit of an illegal search. In a short written order the district court found that Recalde had knowingly and voluntarily consented to the search of his vehicle and denied the motion to suppress.[3] Later, represented by new counsel, Recalde requested reconsideration of his motion to suppress, and the district court held a second hearing. Recalde challenged the search at the station on the grounds that he was unlawfully seized and detained on the highway and at the station. The district court rejected this argument. The court made no findings but, ruling from the bench, denied the motion. In so doing, the court erred.

## II.

The Government conceded in the district court, and concedes on appeal, that the search of Recalde's car at the Moriarty station was not based on probable cause or a judicial warrant. The Government also does not assert any exception to the warrant requirement, such as exigent circumstances, *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), or a search incident to arrest, *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). The Government relies entirely on the consent form Recalde signed at the station. For the reasons set forth below, the validity of Recalde's consent at the station turns on the lawfulness of his earlier detention and movement into Moriarty.

---

**3.** The district court's order provided:

"This matter came on for consideration on the defendant's motions for suppression of physical evidence and to dismiss. Having considered the motions, the briefs of counsel, and the evidence presented at the suppression hearing on December 30, 1983, I find that the defendant gave a knowing and voluntary consent to search his vehicle and that he has not been deprived of his right to a speedy trial. Now, Therefore,

IT IS ORDERED that defendant's motions shall be, and hereby are, denied."

Rec., vol. I, at 29.

The Government argues that Recalde voluntarily accompanied the officers into Moriarty. The Government alternatively argues that even if Recalde did not consent to accompany Christian and Armijo, his movement to Moriarty was justified as a lawful investigative detention. Finally, the Government contends that Recalde consented to the search by signing the consent form.

### A. Recalde's Consent to the Trip to Moriarty

■ The Government argues that Recalde was not unlawfully seized because he agreed to accompany the police to Moriarty. Whether consent is in fact voluntary, or is the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances. *United States v. Mendenhall,* 446 U.S. 544, 557, 100 S.Ct. 1870, 1878, 64 L.Ed.2d 497 (1980); *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 248–49, 93 S.Ct. 2041, 2047, 2058–59, 36 L.Ed.2d 854 (1973); *United States v. Prichard,* 645 F.2d 854, 857 (10th Cir.1981), *cert. denied,* 454 U.S. 832, 102 S.Ct. 130, 70 L.Ed.2d 110 (1981). The Government has the burden of proving that consent was given freely and voluntarily. *Mendenhall,* 446 U.S. at 557, 100 S.Ct. at 1878; *Schneckloth,* 412 U.S. at 222, 93 S.Ct. at 2045; *cf. United States v. Donahue,* 442 F.2d 1315, 1316 (10th Cir. 1971).

■ In determining the specifics necessary to sustain the burden of showing that consent was voluntary, this court has established a three-tiered analysis. First, there must be clear and positive testimony that the consent was unequivocal and specific. Second, the Government must establish that the consent was given without duress or coercion. Finally, we evaluate those first two standards with the traditional indulgence of the courts against a presumption of waiver of constitutional rights. *See United States v. Abbott,* 546 F.2d 883, 885 (10th Cir.1977); *Villano v. United States,* 310 F.2d 680, 684 (10th Cir. 1962). Applying these standards to the facts in this case as analyzed below, we conclude that Recalde did not voluntarily follow the police to Moriarty.[4]

■ When Recalde was asked or directed to accompany Christian and Armijo, he was in the presence of two uniformed officers, one of whom had arrived on the scene as a reinforcement after the initial stop. His car trunk and luggage had already been searched. Officer Christian held Recalde's driver's license and vehicle registration and had not returned them to Recalde nor in any way indicated that he would. Although Recalde had signed the traffic ticket, Christian had not given him a copy of it. Recalde was never told he was free to go, and he testified that he did not feel free to leave because "[I] [n]ever got back my registration. Never got through with the ticket. That means he wasn't finished with me." Rec., vol. II, at 56. Moreover, Christian had already determined that he would not permit Recalde to leave in the car[5] and while Christian testi-

---

4. As noted earlier, the district court made no specific finding except that Recalde consented to the search at the station. *See* note 3, *supra.* The record, however, contains sufficient undisputed facts to support our conclusion. *See Brown v. Illinois,* 422 U.S. 590, 604, 95 S.Ct. 2254, 2262, 45 L.Ed.2d 416 (1975) (remand for further factual determination unnecessary where determination could be made from record).

5. On direct examination during the suppression hearing, Christian stated in response to the prosecutor's questions:
 "Q. All right. Let me ask you this question: Officer, if Mr. Recalde had refused to follow you to Moriarty, was he free to go?

A. He was sir. The vehicle would not have been—have been at that point. He would have been free to go. Yes, sir.
Q. He would have had to walk?
A. Yes, sir. Yes, I would have attempted to do what I could have at that point to obtain a search warrant, if possible.
Q. But you would have held the car?
A. Yes, sir. Would have held the car, but he would have been free to go. Yes, sir.
Q. Would you have provided him transportation?
A. If—if he needed to get to Edgewood or Moriarty. Yes, sir.

fied that he would have permitted Recalde to leave on foot, he never indicated this to Recalde. We reject any suggestion that Recalde could have done so. Recalde was traveling alone and was in the middle of a sparsely populated area of rural New Mexico, five miles from the nearest town. He was caught in the middle of a heavy rainstorm and all of his luggage was locked in the trunk of his car. Recalde, a resident alien, could reasonably have felt constrained and unable to simply terminate his confrontation with Officers Christian and Armijo. He gave undisputed testimony that his upbringing and experiences in Argentina had instilled in him an acquiescence to police authority. This factor is certainly relevant to the issue of coercion. *See Schneckloth,* 412 U.S. at 226, 93 S.Ct. at 2047; *see also Mendenhall,* 446 U.S. at 558, 100 S.Ct. at 1879.

Based on the undisputed facts in the record, we thus conclude that the Government failed to sustain its burden of establishing both the absence of any duress or coercion and the specific and unequivocal nature of any consent. Whether he was asked or not, Recalde was confronted with a coercive custodial situation in which he had no real choice but to comply. Accordingly, we hold that Recalde did not consent to be taken to the station house in Moriarty.

### B. Investigative Detention

The Government contends that, in any event, Recalde's detention on the highway, the trip into Moriarty, and the detention at the station were justified under the Supreme Court's decision in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and subsequent decisions interpreting *Terry.*[6] We are not persuaded.

■ *Terry* permits police officers who suspect criminal activity to make limited intrusions on an individual's personal security based on less than probable cause. *Michigan v. Summers,* 452 U.S. 692, 698, 101 S.Ct. 2587, 2592, 69 L.Ed.2d 340 (1981). In order to justify an investigative stop, an officer need have only a reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity. *Terry,* 392 U.S. at 20–22, 88 S.Ct. at 1879–1881; *see also United States v. Cooper,* 733 F.2d 1360, 1363 (10th Cir.), *cert. denied,* ─── U.S. ───, 104 S.Ct. 3543, 82 L.Ed.2d 847 (1984). In evaluating the reasonableness of an investigative stop, courts are to examine

> "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place."

*Terry,* 392 U.S. at 20, 88 S.Ct. at 1879; *see also United States v. Sharpe,* ─── U.S. ───, ───, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605 (1985). This assessment of reasonableness is essentially a balancing test. As the Supreme Court has noted:

> "The exception to the probable-cause requirement for limited seizures of the person recognized in *Terry* and its progeny rests on a balancing of the competing interests to determine the reasonableness of the type of seizure.... We must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion. *When the nature and extent of the detention are minimally intrusive of the individual's Fourth Amendment interests,* the opposing law enforcement interests can support a seizure based on less than probable cause."

*United States v. Place,* 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983) (emphasis added). Applying the standards

---

Q. Oh, in fact, when you stopped him and issued the citation, the car was seized; is that correct?

A. I would say the vehicles [sic] was under detainment for suspected transport of illegal narcotics."

Rec., vol. II, at 27–28.

**6.** The Government concedes that the officers did not have probable cause to arrest Recalde on the highway either for possession of a stolen vehicle or for narcotics.

governing the limits of a permissible *Terry* stop, we conclude that the officers' actions exceeded these limits.

■ Recalde concedes that he was speeding and on appeal does not dispute the lawfulness of Christian's initial stop of his car. The stop and the requirement that Recalde display his driver's license and vehicle registration were lawful and necessary in carrying out New Mexico statutes regulating motor vehicles. *Cf. United States v. Lepinsky*, 460 F.2d 234, 237 (10th Cir.1972). Recalde also does not challenge the search of his car trunk and luggage conducted on the highway. The record indicates that this search was made only after Recalde freely consented, and nothing in the record casts doubt on the voluntariness of this consent.

Furthermore, under the circumstances a brief delay while Christian issued a traffic citation was inevitable, proper, and minimally intrusive. *See Place*, 462 U.S. at 702, 103 S.Ct. at 2642. Recalde does not challenge these actions nor does he challenge the slight incremental delay resulting from Christian's decision to conduct an NCIC check on his police radio. The radio NCIC check was conducted quickly and concurrently with issuing the citation. Given the circumstances facing him, up to this point Christian acted in a diligent and reasonable manner. *Cf. Sharpe*, —— U.S. at ——, 105 S.Ct. at 1575.

■ However, Recalde's subsequent extended detention and movement cannot be justified. The record clearly indicates that the officers' subsequent actions were motivated entirely by their suspicions of narcotics.[7] Christian testified that he had made up his mind early out on the highway that he would detain the car and attempt to obtain a search warrant, yet he did not place Recalde under arrest.[8]

Recently, in *Sharpe*, —— U.S. ——, 105 S.Ct. 1568, 84 L.Ed.2d 605, the Supreme Court reviewed and clarified the limits governing an investigative stop. *Sharpe* involved the roadside investigative detention of an automobile by the police on less than probable cause to arrest. The Court of Appeals had held that the length of detention alone made the stop an arrest that violated the Fourth Amendment. The Supreme Court was thus concerned with whether the police conduct had transformed the detention from a *Terry* stop into a *de facto* arrest. Rejecting any absolute time limit for such stops, the Court reversed. It held that the test for whether the length of a *Terry* stop met the Fourth Amendment reasonableness requirement was whether the police investigated "in a diligent and reasonable manner" that is "likely to confirm or dispel their suspicions quickly." *Sharpe*, —— U.S. at ——, 105 S.Ct. at 1575. In rejecting a *per se* time limitation, the Court specifically noted that a number of other factors remained rele-

---

7. The Government on appeal appears to argue that a trip to Moriarty was necessary for further investigation of the automobile's status. The record, however, totally fails to support this argument. As noted earlier, Christian never pursued any further investigation and his testimony indicated he never intended to. This argument is also totally inconsistent with Christian's testimony that Recalde could leave but the car would remain. *See* note 5, *supra*. Had Christian suspected that Recalde was driving a stolen vehicle, he would clearly not have allowed him to depart. Yet Christian testified that he would have permitted Recalde to walk away, while having to leave the car with the officers. Moreover, Christian admitted he had no reason to believe the car was stolen and his testimony clearly indicates that his sole concern was his suspicion of narcotics. *See* note 1, *supra*.

The Government's argument is also inconsistent with our conclusion concerning the unlawfulness of detaining and moving Recalde from the highway absent probable cause. *See* discussion of *Hayes v. Florida*, —— U.S. ——, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985), *infra*, and note 8 *infra*.

8. There were also no exigent circumstances necessitating any movement of Recalde or the car off the highway. We therefore do not reach the issue of whether exigent circumstances might permit such movement. We note only that the Supreme Court has not yet addressed this issue in an investigative detention situation. *See Hayes v. Florida*, —— U.S. ——, n. 3, 105 S.Ct. 1643, n. 3, 84 L.Ed.2d 705 (1985).

vant and dispositive of a stop's lawfulness. In deciding the issue, the Court reviewed a number of its decisions handed down after *Terry*. *See Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110; *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (White, J., for the plurality); *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). The Court acknowledged that *"Terry, Dunaway, Royer,* and *Place,* considered together, may in some instances create difficult line-drawing problems in distinguishing an investigative stop from a *de facto* arrest." *Id.* at ——, 105 S.Ct. at 1575.

The Court distinguished the situation in *Sharpe* from that in *Dunaway* and *Royer*, where the Court had held that a defendant's detention constituted an arrest. As the Court emphasized, the critical facts in *Dunaway* were that "(1) the defendant was taken from a private dwelling; (2) he was transported unwillingly to the police station; and (3) he there was subjected to custodial interrogation...." *Id.* at n. 4. Similar facts were present in *Royer*, which involved the detention of a suspected narcotics smuggler at a public airport. In *Royer*, state drug agents, after requesting and receiving the defendant's airline ticket and driver's license, then requested that he accompany them to a small nearby airport room for questioning. The defendant was alone in the room with the agents who never informed him he was free to leave. Based on these facts, the Court in *Royer* held that the consensual aspects of the encounter had evaporated and the detention had exceeded the permissible bounds of an investigative stop. *Royer*, 460 U.S. at 502–503, 103 S.Ct. at 1326–1327.

■ In *Sharpe*, the Court noted that in *Dunaway* and *Royer* the defendant's detention was " 'in important respects indistinguishable from a traditional arrest.' " *Sharpe*, —— U.S. at ——, 105 S.Ct. at 1574 (quoting *Dunaway*, 442 U.S. at 212, 99 S.Ct. at 2256). The crucial facts present in

*Dunaway* and *Royer* are also present here. The record amply supports the conclusion that Recalde's involuntary detention and movement into Moriarty were in all important respects indistinguishable from a traditional arrest. *Dunaway*, 442 U.S. at 212, 99 S.Ct. at 2256; *see also Sharpe,* —— U.S. at ——, 105 S.Ct. at 1573. He was taken from a public highway without his consent and transported five miles to a police station, where he was placed in a small room for further investigation and questioning. In addition, the circumstances and facts surrounding his seizure and detention fall far short of the standard for probable cause to arrest. *Royer*, 460 U.S. at 507, 103 S.Ct. at 1329; *Dunaway*, 442 U.S. at 216, 99 S.Ct. at 2258.

■ The inescapable conclusion to be drawn from the record is that the officers, lacking probable cause to arrest Recalde for a stolen vehicle or possession of narcotics, seized, detained, and transported him to Moriarty without his consent in the hope of developing sufficient probable cause or obtaining a consent to search in a more custodial setting.[9] *Cf. Royer*, 460 U.S. at 505, 103 S.Ct. at 1328. The police conduct in this case cannot be characterized as minimally intrusive. This sort of police activity is an abuse of investigative detention and violates the Fourth Amendment.

Our conclusion is confirmed by the Supreme Court's decision in *Hayes v. Florida,* —— U.S. ——, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985), decided the same day as *Sharpe*. In *Hayes*, the Court reaffirmed its prior holding in *Davis v. Mississippi*, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969), and reversed a conviction obtained through a detention similar to that before us in this case. *Hayes,* —— U.S. at ——, 105 S.Ct. at 1645. The Court emphatically rejected the claim that a *Terry* investigative detention could be the basis for justifying an arrest or for taking a suspect into police custody at a station house. The Court stated

---

**9.** Christian admitted at the suppression hearing that when the officers and Recalde arrived at the station "He was still not under arrest. *I just* *wanted to ask him some questions."* Rec., vol. II, at 21 (emphasis added).

"There is no doubt that at some point in the investigative process, police procedures can qualitatively and quantitatively be so intrusive with respect to a suspect's freedom of movement and privacy interests as to trigger the full protection of the Fourth and Fourteenth Amendments. *Dunaway*, 442 U.S., at 212 [99 S.Ct. at 2256]; *Florida v. Royer*, 460 U.S. 491, 499 [103 S.Ct. 1319, 1325, 75 L.Ed.2d 229] (1983) (plurality opinion). *And our view continues to be that the line is crossed when the police, without probable cause or a warrant, forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes.* We adhere to the view that such seizures, at least where not under judicial supervision, are sufficiently like arrests to invoke the traditional rule that arrests may constitutionally be made only on probable cause."

*Id.* (emphasis added).

Accordingly, in moving and detaining Recalde involuntarily and without probable cause, officers Christian and Armijo exceeded the limits of a lawful investigative detention and violated the Fourth Amendment.[10]

### C. *Recalde's Consent to the Search at the Station*

 The question remains, however, whether Recalde's consent to the search at the station was valid despite the unlawful seizure and detention. *See Mendenhall*, 446 U.S. at 558, 100 S.Ct. at 1879; *cf. Dunaway* 442 U.S. at 216, 99 S.Ct. at 2258. The district court held that Recalde's consent to this search was knowing and volun-

tary but made no specific findings concerning the basis for its conclusion. *See* note 3 *supra.* By focusing only on the voluntariness of Recalde's consent at the station and in not considering whether he had been unlawfully seized, we believe the court misapplied the Supreme Court decisions governing this issue.

The Supreme Court has consistently held that evidence obtained after an illegal arrest or seizure must be suppressed as the fruit of the illegal detention. *See Hayes,* — U.S. at ——, 105 S.Ct. at 1645; *Royer,* 460 U.S. at 507–508, 103 S.Ct. at 1329–1330; *Dunaway,* 442 U.S. at 216–19, 99 S.Ct. at 2258–60; *Davis,* 394 U.S. at 724, 89 S.Ct. at 1396. There is, however, no per se rule prohibiting use of such evidence, and a defendant's consent may, under certain circumstances, remove the taint of an illegal detention. *See Dunaway,* 442 U.S. at 216–17, 99 S.Ct. at 2258–59; *Brown v. Illinois,* 422 U.S. 590, 603, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975); *see also United States v. Troutman,* 590 F.2d 604, 606 (5th Cir. 1979); *United States v. Ballard,* 573 F.2d 913, 916 (5th Cir.1978); *cf. United States v. Davis,* 456 F.2d 1192, 1194 (10th Cir.1972). Voluntariness is a question of fact to be determined from the totality of the circumstances, *Schneckloth,* 412 U.S. at 227, 93 S.Ct. at 2047, and we accept the trial court's finding unless it is clearly erroneous, *Cooper,* 733 F.2d at 1364. When attempting to establish that there was voluntary consent after an illegal stop, however, the Government has a heavier burden to carry than when the consent is given after a permissible stop. *Troutman,* 590 F.2d at 606; *Ballard,* 573 F.2d at 916.

 Moreover, when consent is obtained after an illegal arrest, the Govern-

---

10. The Government also contends that earlier decisions of this court authorize the detention in this case, relying on *United States v. Lepinski,* 460 F.2d 234 (10th Cir.1972), *United States v. Fallon,* 457 F.2d 15 (10th Cir.1972), and *United States v. Self,* 410 F.2d 984 (10th Cir.1969). We disagree. In each of these earlier cases, neither the car's driver nor the occupants could produce proof of the vehicle's registration or ownership, a more suspicious situation than the present

case. Moreover, in each of these cases the defendants voluntarily accompanied the police officer to the station. Finally, all three cases were decided prior to the Supreme Court's decisions in *Hayes, Sharpe,* and *Royer.* They must therefore be read in light of the Court's more recent refusal to expand and extend *Terry* to the nonconsensual transportation to, and investigative detention at, a police station.

ment must establish a break in the causal connection between the illegality and the evidence thereby obtained. *Dunaway*, 442 U.S. at 217–18, 99 S.Ct. at 2259–60; *Brown*, 422 U.S. at 602–605, 95 S.Ct. at 2261–2263. An alleged voluntary act must be "sufficiently an act of free will to purge the primary taint" of the illegal detention. *Id.* at 602, 95 S.Ct. at 2261 (quoting *Wong Sun v. United States*, 371 U.S. 471, 486, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963)).

The record indicates that the district court found the consent at the station to be voluntary without considering whether Recalde had been unlawfully seized and detained.[11] The court therefore did not make its finding in light of the requirement that such consent be free from the taint of the illegal detention. Because of this, and because the illegal nature of Recalde's seizure and detention are critical, we conclude that the district court's finding of consent is clearly erroneous.

The Court in *Dunaway* and *Brown* identified several factors to be considered in determining whether evidence is obtained by exploitation of an illegal detention or whether the causal connection has been broken. These factors are the temporal proximity of the arrest and the consent, the presence of intervening circumstances, and particularly the purpose and flagrancy of the official misconduct. *Dunaway*, 442 U.S. at 218, 99 S.Ct. at 2259; *Brown*, 422 U.S. at 603–604, 95 S.Ct. at 2261–2262.

It is undisputed that Officer Christian gave Recalde *Miranda* warnings when they arrived at the station. It is also undisputed that Recalde then signed the consent-to-search form Christian had given him. While these acts can satisfy the requirement of intervening circumstances, *see Troutman*, 590 F.2d at 606; *cf. Ballard*, 573 F.2d at 916, the Government in this case failed to meet its burden of proving that Recalde's consent was free from the

taint of his detention in light of the numerous other relevant facts."

First, while relevant and important, *Miranda* warnings per se cannot break, for Fourth Amendment purposes, the causal connection between the illegality and evidence obtained by exploitation of an illegal arrest. *See Dunaway*, 442 U.S. at 216–217, 99 S.Ct. at 2258–2259; *Brown*, 422 U.S. at 603, 95 S.Ct. at 2261. The admissibility of the evidence must be considered in light of the distinct policies and interests of the Fourth Amendment and the exclusionary rule. *See id.* at 602, 95 S.Ct. at 2261. As the Court noted in *Brown*:

> "If *Miranda* warnings, by themselves, were held to attenuate the taint of an unconstitutional arrest, regardless of how wanton and purposeful the Fourth Amendment violation, the effect of the exclusionary rule would be substantially diluted. See *Davis v. Mississippi*, 394 U.S. 721, 726–727 [89 S.Ct. 1394, 1397–1398, 22 L.Ed.2d 676] (1969). Arrests made without warrant or without probable cause, for questioning or 'investigation,' would be encouraged by the knowledge that evidence derived therefrom could well be made admissible at trial by the simple expedient of giving *Miranda* warnings. Any incentive to avoid Fourth Amendment violations would be eviscerated by making the warnings, in effect, a 'cure-all,' and the constitutional guarantee against unlawful searches and seizures could be said to be reduced to 'a form of words.' See *Mapp v. Ohio*, 367 U.S. [643] at 648 [81 S.Ct. 1684, at 1688, 6 L.Ed.2d 1081 (1961)]."

*Id.* at 602–03, 95 S.Ct. at 2261 (footnote omitted).

The Government also relies on the fact that the consent form Recalde signed contained a provision that he could refuse to consent. While certainly probative, this fact is also not dispositive on the issue of voluntariness. Recalde testified that he

---

11. Recalde's argument that his detention was unlawful under *Royer* was raised in the second suppression hearing. The record indicates that the district court believed the *Royer* decision inapposite and therefore did not consider it. In any event, the court made no finding on the implications of *Royer* when it denied Recalde's motion from the bench.

does not read English well, and it is undisputed that Christian merely handed him the form to sign without reading it to him. Recalde had just been seized from the highway and escorted between two police cars to an empty police station where he was taken into a small room by the two officers. He was never told he was free to leave. To the contrary, he was handed a blank consent form by an officer who held his ticket, his driver's license, and his registration. The officers never indicated that they had concluded any aspect of their investigation and Recalde was not, by any objective standard, free to go. These coercive circumstances, immediately following an unlawful seizure and detention, were not at all counter-balanced by a consent form presented to Recalde in the manner described above. Accordingly, the circumstances surrounding his execution of the consent form were not sufficiently free of duress and coercion so as to remove the taint of the illegal detention.[12] *See Dunaway*, 442 U.S. at 219, 99 S.Ct. at 2260.

Furthermore, as noted above, Recalde signed the form several minutes after reaching the station and being placed in the small room. Very little time had therefore elapsed between the detention and the consent. *See Brown*, 422 U.S. at 604, 95 S.Ct. at 2262. Moreover, the illegality here, as in *Brown*, "had a quality of purposefulness." *Id.* at 605, 95 S.Ct. at 2262. Christian acknowledged in his testimony that Recalde was detained and taken into Moriarty for investigation and questioning. *See id.; see also* note 9, supra. "The arrest, both in design and in execution, was investigatory. The [officers] embarked upon this expedition for evidence in the hope that something might turn up." *Brown*, 422 U.S. at 605, 95 S.Ct. at 2262. Thus, not only were the intervening circumstances ineffective to overcome the evidence of coercion and duress, the two other factors set forth in *Brown* weigh in favor

of the conclusion that in this case the causal connection between the illegal detention and consent remained unbroken.

The district court, in deciding this issue, erred in not assessing the issue under all of the factors governing an illegal detention and a subsequent consent. Accordingly, under the standards of *Royer, Dunaway* and *Brown*, Recalde's consent to search was tainted by his illegal arrest and the evidence seized as a result must be suppressed. *Cf. Hayes*, ── U.S. at ──, 105 S.Ct. at 1645; *Davis*, 394 U.S. at 724, 89 S.Ct. at 1396.

The judgment is reversed.

McWILLIAMS, J., dissents.

---

**12.** The Government, relying on *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), urges that we consider Recalde's earlier cooperative attitude and actions when assessing the voluntariness of his consent

at the station. Because we have determined that his detention and movement to Moriarty were such that his acquiescence was not voluntary, we conclude that his earlier actions are irrelevant.