UNITED STATES

v.

Staff Sergeant Donald P. KOSEK,
FR164–54–7345, United States
Air Force.

Misc. Dkt. No. 93–23.

U.S. Air Force Court of Military Review.

31 March 1994.

Appellate Counsel for Appellant: Colonel Jay L. Cohen and Captain Joel R. Reifman.

Appellate Counsel for the United States: Colonel Jeffery T. Infelise, Lieutenant Colonel Thomas E. Schlegel, and Captain Timothy G. Buxton.

Before SNYDER, RAICHLE, and YOUNG, Appellate Military Judges.

## OPINION OF THE COURT

SNYDER, Senior Judge:

The United States has filed a timely appeal pursuant to Article 62, UCMJ, 10 U.S.C. § 862 (1988), asserting the military judge erroneously excluded evidence in this case. Upon review of the parties' very able briefs, and the record, we conclude the military judge erred and reverse.

## I. FACTS

The military judge determined the essential facts as follows:

1. By 4 June 1993 OSI Special Agents [D] and [M] learned from the accused's roommate that the accused was possibly

using cocaine, that he had taken the train to New York City to obtain cocaine and that he was expected to return on 5 June 1993. The accused's car was parked at Union Station, Utica, New York. The agents visited the station and watched the car each time a train was expected. At approximately 1945 hours on 5 June 1993, upon returning from a break, they observed that the car was gone.

2. On 4 June 1993, OSI agents had conducted a common area search of the premises shared by the accused and his roommate. During the course of the search they seized a receipt for a 44 magnum Colt Anaconda purchased by the accused.... Having learned of the existence of this receipt, SA D was aware that the accused owned this gun at the time he began the surveillance of the accused's automobile on 5 June 1993.

3. Having failed to catch the accused at the train station, at about 1945 hours on 5 June 1993, Agents D and M decided to look for him at his home in Booneville, New York. In an attempt to ensure that the accused was home, M called the home from the car, in the process revealing his identity as an OSI agent. By the time they reached the accused's home, he had left. Shortly thereafter his car was discovered in the parking lot of the Halfway House bar. The agents entered the bar at approximately 2000 hours.

4. They saw the accused in a back room shooting pool. They went to him, identified themselves as OSI agents and asked him to come outside. The accused took his black leather motorcycle jacket from a shelf, put it on, and zipped it halfway up. Having observed the accused wearing the jacket, I note that it closely conforms to his body.

5. Once outside, SA M gave what he termed as a "preamble" to the 32 [sic] rights advisement, informing the accused that "they were on to him" and that other agencies were on to him. At this time SA D stood approximately 12 to 18 inches from the accused. The accused became somewhat agitated and began patting his chest searching for his cigarette lighter.

Not able to find the lighter in his chest pockets he began to reach into his lower left pocket. At this point SA D said, "where is it" at the same time grabbing the accused's wrist. The accused pulled out a round hockey puck sized tin and a straw.... At the same time he said, "you mean this," and he handed the two objects to SA D. Agent D opened the tin and observed a powdery white substance. SA M observed white particles on the straw.

6. The accused was not frisked prior to his reaching into his pocket.

7. At this point (approximately 2015 hours) SA M read the accused his Article 31 rights for the first time. It was still sufficiently light that SA M not only could see white particles on the straw, but he could also read from his rights advisement card. No weapon was found on the accused. Approximately 15 minutes later the parties returned to the accused's house. At that time the accused executed a voluntary consent to search his person, automobile and house.... During the discussions [advisement on consent to search and right to refuse] the accused objected to the phrase "distribution" saying he did not sell cocaine. After SA M explained that this phrase was mainly a description of the evidence they were searching for, the accused signed the form.

8. The accused cooperated in the seizure of additional containers of white powder in a clothes basket in the trunk of his car, ... and in a shirt in his roommate's closet.... The search of the automobile concluded at approximately 2130 hours.

9. Next the accused was interviewed. This process included the writing of a confession and a return to the house to obtain additional cocaine, the existence of which was revealed in the interview. The accused signed an additional consent to search form, ... and a statement.... The accused refused to sign the confession without first talking to a lawyer, but agreed to initial each page. The interview concluded at approximately 0330 hours. The accused was then taken to the hospital to give a urine sample at 0400.

10. During the interview the accused cooperated and appeared calm. However, he was so inwardly distraught that on two or three occasions he told SA M that he was going to throw up.

11. The accused was told that he could terminate the interview at any time. He was allowed approximately four breaks during this time. No reference was made during the questioning to the hockey puck sized container which SA D had opened nor was it shown to him during the interview. He was readvised of his rights before the interview began. The accused understood both the consent to search form and the rights advisement.

12. Having observed the accused wearing his leather motorcycle jacket, I conclude that an object the size and weight of a 44 magnum Colt of any barrel length would not have been well concealed. Indeed, given light conditions sufficient to permit the reading of a rights advisement card, one would have observed a gun this size bulging from the jacket pocket. In addition, I believe it to be more probable than not that an object weighing approximately three pounds would have been apparent at the time the accused put it on in the bar. (See note 1)

## APPLICATION TO THE FACTS AND DECISION

1. The record establishes that the accused was suspected of possessing cocaine at the time he was confronted at the Halfway House bar. See findings of fact 1–3, 5.

2. The question "where is it?" is an interrogation since it is "reasonably likely to illicit [sic] an incriminating response." [citation omitted]

3. The accused's production of the container and the straw is a statement taken as a result of an interrogation without having afforded the accused his Article 31 rights. Indeed, the government concedes that this evidence could not be used

against him in its case-in-chief.... As a result, any subsequent statements are presumed to be tainted? [citation omitted]

4. The accused's liberty was not restricted, and he was aware of his right to refuse to consent. However, I conclude that he was intimidated by the OSI "preamble" in which he was told that "they were on to him." In addition, although he may have appeared to be outwardly calm, in fact he was repeatedly nauseous. He did not consult with counsel prior to giving the consent to search. Finally, only approximately 15 minutes elapsed between the improperly obtained statement and his execution of the first consent agreement. Because of the short period of time which elapsed between these two events, I credit his testimony that his initial consent to the search was a direct result of the improperly obtained statement. In fact, it is difficult to imagine how the second event could not have flowed directly from the first. (See Note 2) Thus, the record establishes that the initial consent to search, his subsequent consent to search, and confession, derived from the improperly obtained statement.

5. Accordingly, I conclude that the statements of the accused and all derivative evidence ... therefore must be suppressed.

Note 1: A colt 44 magnum Anaconda weighs approximately three pounds.... Even a snub nose version would affect the appearance of the jacket, when it was carried and when it was being worn.

Note 2: I do not accept the government's contention that the accused intended to confess all along. After learning that the OSI was looking for him, he left his home and went to the Halfway House bar rather than immediately turning himself in. In addition, his reaching into his pocket is consistent with his looking for his cigarette lighter rather than a voluntary decision on his part to hand over the hockey puck sized container.[1] This conclusion is evidenced by his prior patting of his chest.

---

1. To place this comment in perspective for the reader, the military judge is referring to the fact that when SA D asked, "where is it?," he was referring to a weapon, not drugs. While trial counsel conceded the agents had to live with the response to this imprecise question, he argued

## II. JURISDICTION

■ The military judge's ruling was one which excluded evidence that is substantial proof of a fact material in the proceeding. *See* Article 62(a)(2), UCMJ, 10 U.S.C. § 862(a)(2) (1988); R.C.M. 908(a). Trial counsel provided notice, with the requisite certification, to the military judge of the Government's intent to appeal within 72 hours, *see* R.C.M. 908(b)(3), and forwarded the appeal and the record of the proceedings to the Government's designated representative within 20 days. Further, appellate government counsel have filed the appeal and its supporting brief with this Court within 20 days. *Courts of Military Review Rules of Practice and Procedure*, Rule 21(d)(1). *See also United States v. Combs*, 38 M.J. 741 (A.F.C.M.R.1993). The Government's appeal meets the subject matter requirement, and it is timely in all respects. Accordingly, the matter is properly before us.

## III. STANDARD OF REVIEW

■ When reviewing Article 62 appeals, we are restricted to acting solely on matters of law, Article 66(c), UCMJ, 10 U.S.C. § 866(c) (1988), notwithstanding. Article 62(b), UCMJ, 10 U.S.C. § 862(b) (1988). On matters of fact, we are bound by the military judge's factual determinations unless they are unsupported by the record or are clearly erroneous. *United States v. Burris*, 21 M.J. 140 (C.M.A.1985); *United States v. Pacheco*, 36 M.J. 530 (A.F.C.M.R.1992).

## IV. DISCUSSION

### A. Legal Standard Applicable to Subsequent Confession

■ Appellant asserts the military judge committed legal error by applying a "presumptive taint" test to whether appellee's subsequent confessions were voluntary and therefore admissible. *See United States v. Ravanel*, 26 M.J. 344 (C.M.A.1988). Appellant avers that, because the Article 31, UCMJ, 10 U.S.C. § 831, violation committed by SA M did not involve coercion, but was a

"technical violation," the military judge should have applied a "totality of the circumstances" test to the evidence. *See United States v. Steward*, 31 M.J. 259 (C.M.A.1990). Appellant urges that, when the applicable totality of the circumstances test is applied, the facts clearly demonstrate that appellee's consent to the various searches, and his subsequent confession, were knowing and voluntary, and were not products of the Article 31 violation by SA M.

Appellee counters by averring the military judge found, and the record supports, coercion, and therefore, the "presumptive taint" test was correctly applied. Appellee specifically avers:

> Once the cocaine was forcefully induced from appellee, the "cat was out of the bag" ... (or the coke was out of the container). His free will was vanquished and all subsequent evidence was tainted by the initial destruction of appellee's free will.

In the alternative, appellee argues his Fourth Amendment rights were violated by the agents' action, and all ensuing evidence was tainted as the fruit of the poisonous tree and is inadmissible. *See Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

■ After determining the applicable facts, the military judge must then apply the correct legal standard or premise to those facts. *United States v. Bradford*, 25 M.J. 181 (C.M.A.1987). Failure to apply the correct legal standard is error as a matter of law, and may be corrected by a reviewing court. *Bradford*, 25 M.J. at 186. We agree with appellant that the military judge applied an erroneous legal standard when determining the voluntariness of appellee's confession. In his "Application" section of his findings, the military judge specifically stated, "[a]s a result, any subsequent statements are presumed to be tainted," and cited *Ravanel*. This was error.

It is now settled that a "totality of the circumstances" analysis is the correct, appli-

---

the accused's surrendering the tin was a voluntary act. He attempted to buttress this argument by asserting that the accused decided he wanted to be caught and confess when he concluded *en*

*route* to the Halfway House bar, and upon his and the agents' cars passing each other, that the agents would find him.

cable legal standard when testing the voluntariness of a confession made at an interrogation subsequent to a violation of an accused's Article 31(b)/*Tempia*[2] rights. As then Senior Judge Everett rued while acknowledging the burial of the so-called "presumptive taint doctrine:"

> I acknowledged that ... Judge Cox and Judge Sullivan "apparently reject the view that any 'presumptive taint' arises from an Article 31(b) violation." If there was any doubt about where the majority of this Court stood on this issue, it was put to rest less than 5 months ago in *United States v. Steward*, 31 M.J. 259 (C.M.A.1990). There, a majority held that the Court of Military Review had erred by "resort[ing] to the presumptive taint doctrine" where it had "found only a technical violation of Article 31(b)." *Id.* at 264. Instead, the majority declared, "The appropriate legal inquiry in such a case is whether his subsequent confession was voluntary *considering all the facts and circumstances of the case* including the earlier technical violation of Article 31(b)."

*United States v. Phillips,* 32 M.J. 76, 80 (C.M.A.1991) (citation omitted) (emphasis in original). In *Steward,* the Court adopted and applied *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), to Article 31(b) violations. The "technical violation" referred to is the failure to give the proper advisement required by Article 31(b), as opposed to situations involving either mental or physical coercion.

In an effort to show coercion, appellee's brief asserts he was "snatched off-duty from a public bar, preambled, [and] assaulted...." The facts, however, clearly reduce this assertion to mere hyperbole. The military judge specifically found appellee's liberty was not restricted. Further, appellee was not assaulted by SA D or M. The military judge's conclusion that SA D and M should have known appellee was not carrying a *specific* weapon erroneously ignored the fact that SA D reacted only when appellee reached into his pocket.[3] *See Pennsylvania v. Mims,* 434 U.S. 106, 111, 98 S.Ct. 330, 333, 54 L.Ed.2d 331 (1977) (patrolman frisked defendant upon observing bulge in his jacket while exiting car); *United States v. Vasquez,* 638 F.2d 507, 520 (2d Cir.1980) (officer drew gun after suspect pulled package back into car, locked car doors, and reached under seat). Further, notwithstanding SA D's and M's concern that appellee might be armed, he was not frisked until after the appellee's sudden movement and discovery of the cocaine. Therefore, we find no evidence of coercion which would preclude application of the totality of the circumstances test.

### B. Impact on Consent to Search Ruling

In ruling on the voluntariness of appellee's consent to search, the military judge analyzed the issue in light of a consensual search subsequent to an illegal interrogation. He

---

**2.** *United States v. Tempia,* 16 U.S.C.M.A. 629, 37 C.M.R. 249, 1967 WL 4235 (1967), applied *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), to military interrogations of criminal suspects. *See also* Mil.R.Evid. 305(c), (d)(1).

**3.** The law does not require a law enforcement officer, upon observing a sudden, unexpected move, to wait at his/her peril to see what a suspect will do or pull from a pocket. *Cf. Sibron v. New York,* 392 U.S. 40, 63–64, 88 S.Ct. 1889, 1903, 20 L.Ed.2d 917 (1968) (officer said "you know what I'm looking for," and specifically disavowed concern defendant was reaching in pocket for weapon).

While the military judge could conclude in the calm of the courtroom 3 months later that appellee was merely reaching for his cigarette lighter, SA D was observing a visibly nervous suspect. The military judge's "after the fact" analysis is reflected in his questions after SA D described his and appellee's actions:

Q: And why did you say [where is it]?
A: I was afraid he was going to pull a weapon.
Q: Well, couldn't you have just said, stop, or something like that?
A: I could have but I was visualizing at that point in time that he was going to pull a weapon out and possibly shoot [SA M] or myself. That was a response by me that was automatic. I was more worried at that time about stopping whatever was going to occur.

Nothing in the military judge's findings show SA D's reaction to have been unreasonable in light of his experience and appellee's movement. *United States v. Vasquez,* 638 F.2d 507, 520 (2d Cir.1980); *see generally, Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The military judge's conclusion to the contrary is wholly unsupported by his factual findings and the record. *United States v. Burris,* 21 M.J. 140 (C.M.A.1985).

cited an applicable precedent and correctly listed the relevant factors to be weighed. *See United States v. Murphy,* 36 M.J. 732 (A.F.C.M.R.1992). When we measure his conclusion against his factual findings, however, we conclude his erroneous use of a "presumptive taint" test also impacted his assessment of the consent issue. Further, he applied an erroneous *per se* lack of attenuation analysis to the 15 minute interval between the discovery of cocaine in the tin and appellee consenting to the search of his car and residence. We will apply the proper totality of the circumstances analysis in Part D, *infra.*

### C. The Subsequent Confession

When analyzing cases such as the one *sub judice,* we must heed Judge Cox's caution that we:

> Maintain a respectable, but clear, distinction between "presumptive taint," "presumptive compulsions," and *"actual facts."* The lack of an Article 31 ... warning creates a "presumption of compulsion" and results in exclusion of the statements. Subsequent statements may or may not be "tainted" depending on the facts.

*United States v. Spaulding,* 29 M.J. 156, 162 n. 1 (C.M.A.1989) (Cox, J., concurring) (citations omitted) (emphasis added). We will now apply the totality of the circumstances test to the actual facts surrounding the subsequent events.

■ Appellant properly concedes SA M violated Article 31(b) when he started his preamble prior to warning appellee of his Article 31(b) rights. *United States v. Byers,* 26 M.J. 132 (C.M.A.1988). Because appellee surrendered the straw and tin containing cocaine before SA M started the Article 31 advisement, there was an incriminating response between the preamble and advisement. *Cf. Byers,* 26 M.J. at 135. Although surrendering the tin and straw was a physical act, it was in response to an improper question and tantamount to a statement. *United States v. Corson,* 18 U.S.C.M.A. 34, 39 C.M.R. 34, 1968 WL 5051 (1968). Therefore, the tin and straw are inadmissible in evidence, and their exclusion fully protects appellee from that particular violation of his rights. The next question is was his subse-

quent confession a product of that violation? We believe it was not.

■ Immediately after discovering cocaine was in the tin, SA M fully advised appellee of his Article 31/*Tempia* rights. Appellee acknowledged understanding of his rights and waived them. Prior to beginning the interview some four hours later at the OSI office, appellee was readvised of his rights, and he again waived them. Providing an advisement of rights subsequent to an illegal interrogation does not automatically render a subsequent confession admissible, but it is a relevant factor to be weighed. This is also the case with the absence of a cleansing warning; it is relevant, but not determinative. *Steward,* 31 M.J. at 265; *Spaulding,* 29 M.J. at 162. The military judge found appellee fully understood his rights.

The military judge found that, although outwardly calm, appellee was nauseous and inwardly distraught. He did not, however, find that appellee's distress was due to any illegal act by either SA D or M. A suspect's distress or tension due to the realization that one's criminality is now known, or to concern for collateral consequences, is vastly different from distress due to duress or coercion induced by investigators. *Elstad,* 470 U.S. at 312, 105 S.Ct. at 1294, 84 L.Ed.2d at 234 citing *United States v. Bayer,* 331 U.S. 532, 540–541, 67 S.Ct. 1394, 1398–1399, 91 L.Ed. 1654, 1660 (1947); *see United States v. Goudy,* 32 M.J. 88 (C.M.A.1991); *United States v. Fazio,* 914 F.2d 950, 954 (7th Cir.1990) (pressure to reopen restaurant as soon as possible self-imposed). In this regard, it is especially noteworthy that the military judge found there was no subsequent exploitation of, or any attempt to exploit, the straw or the tin and its content. It was neither referred to nor shown to appellee during the remainder of the evening. Appellee was told he could terminate the interview at any time, and he was allowed a break on all four occasions he requested one.

The essential facts reflect appellee, at all times, was aware of his rights and willing to assert them at his discretion. As we will discuss *infra,* he refused to consent to the search unless a certain word was deleted

from the form. Another telling factor, however, and a most significant one, is appellee specifically asserted his rights after providing his oral statement. When asked to sign the statement he had provided, appellee pointedly refused to sign it until he consulted with a lawyer. As required by law,[4] SA M immediately asked appellee if he was requesting a lawyer at that point in time, and appellee stated, no. He then agreed to initial each page and he inserted into the statement in his handwriting the fact he would not swear to or sign the statement until after he consulted with a lawyer. Further, in view of the absence of coercion or efforts to exploit the illegally gained evidence, there are no Fifth Amendment or policy reasons to exclude the subsequent confession. *See United States v. Butner*, 15 M.J. 139 (C.M.A.1983); *cf. Butner*, 15 M.J. at 145 (Fletcher, J., dissenting).

Therefore, assessing the totality of the circumstances, including giving appropriate consideration to the earlier Article 31(b) violation and the absence of a cleansing warning along with the two subsequent advisements of rights, the evidence clearly establishes that appellee acted pursuant to his free will in waiving his rights and making the admissions, and his subsequent confession was a product thereof and not the earlier article 31(b) violation. *Steward*, 31 M.J. at 265; *Spaulding*, 29 M.J. at 162.

### D. Fourth Amendment Attenuation Analysis

■ Our finding appellee's confession voluntary does not end the matter for appellant. As appellee ably argued in his brief, the facts reflect the Fourth Amendment was triggered when SA D opened the tin and discovered the cocaine. Although the tin was revealed as the partial result of a perceived hostile move by appellee, the tin plainly was not a weapon or an object easily used as a weapon. Consequently, SA D was not, without appellee's permission or a search authorization, at liberty to open the tin once its nature was apparent. Under the specific circumstances of this case, he performed an illegal search when he opened it.

Because the rights and interests protected by the Fourth Amendment are distinct from those protected by the Fifth Amendment and Article 31, whenever the Fourth Amendment is violated, finding an ensuing confession voluntary is merely a threshold question. The reviewer must apply the relevant factors in light of these distinct interests and test the subsequent consents to search and the confession for attenuation of the prior illegality. *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

■ The military judge, during argument on the suppression motion, queried counsel on whether the Fourth Amendment was triggered, but he did not conduct a *Brown v. Illinois* attenuation analysis. His finding the confession involuntary may have accounted for his not doing so. Although the factfinder normally is the one to perform this analysis, a reviewing court, even one without factfinding power, may conduct the analysis if the record is of "amply sufficient detail and depth from which the determination may be made." *Brown*, 422 U.S. at 604, 95 S.Ct. at 2262, 45 L.Ed.2d at 427–28; *see United States v. Guzman*, 864 F.2d 1512, 1521 n. 10 (10th Cir.1988); *United States v. Recalde*, 761 F.2d 1448 (10th Cir.1985). We find the record of amply sufficient detail and depth for us to make the necessary determination. The key sequence of events occurred between the discovery of the cocaine on appellee's person and his giving the consent to search his car and living area. If these events do not support a finding of attenuation as to the consent to search, then attenuation of the later confession is unlikely.

■ Whether a consent to search is voluntary is determined on the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *United States v. Frazier*, 34 M.J. 135 (C.M.A.1992); *United States v. Goudy*, 32

---

4. *United States v. McLaren*, 38 M.J. 112 (C.M.A. 1993); *United States v. Moore*, 38 M.J. 644 (A.F.C.M.R.1993); *see also Minnick v. Mississippi*, 498 U.S. 146, 153, 111 S.Ct. 486, 491, 112 L.Ed.2d 489, 497 (1990); *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981).

M.J. 88 (C.M.A.1991). The totality requirement applies notwithstanding a prior violation of the Fourth Amendment. *Recalde*, 761 F.2d at 1456.

Analysis of the *Brown* factors is on an *ad hoc* basis dependent on the unique facts of each case. It is not a *per se* or *but for* analysis (but for the initial illegality, subsequently found evidence would not have been sought). *Brown*, 422 U.S. at 603, 95 S.Ct. at 2262, 45 L.Ed.2d at 427; *United States v. Williams*, 35 M.J. 323 (C.M.A.1992). The relevant *Brown* factors which we must apply to the facts are: whether a *Miranda* warning was given and whether one was advised of the right to refuse to consent to a search; the temporal proximity of the prior illegal search to the consent to search and confession, the presence of intervening circumstances, and particularly, the purpose and flagrancy of the official misconduct. *Brown*, 422 U.S. at 604, 95 S.Ct. at 2262. These factors are not weighed equally, and the Government need not have all of them weighed in its favor to attenuate a prior illegality. *Taylor v. Alabama*, 457 U.S. 687, 694, 102 S.Ct. 2664, 2669, 73 L.Ed.2d 314, 322 (1982) (O'Connor, J., dissenting); *Rawlings v. Kentucky*, 448 U.S. 98, 107, 100 S.Ct. 2556, 2563, 65 L.Ed.2d 633, 643 (1980) (plurality opinion); *see also Dunaway v. New York*, 442 U.S. 200, 226, 99 S.Ct. 2248, 2263, 60 L.Ed.2d 824, 844–45 (1979) (Rehnquist, J., dissenting); *Phillips*, 32 M.J. at 80; *United States v. Wellins*, 654 F.2d 550 (9th Cir.1981).

Applying the first *Brown* factor, we have noted appellee was fully advised of his Article 31/*Tempia* rights by SA M immediately after SA D opened the tin and discovered cocaine therein. Appellee acknowledged understanding of his rights and waived them. Appellee also received full advisement of his rights applicable to a consent to search. He was fully advised of his right to refuse consent and SA M explained the consent form to appellee prior to his executing it.

The second *Brown* factor is the temporal proximity of the initial consent to search to the illegal opening of the tin. As noted above, the military judge applied an erroneous legal standard to this factor when he concluded the brief elapsed period of 15 min-

utes automatically precluded a finding that appellee's waiver of his rights and his consent to search were products of his free will. The lack of a significant intervening period of time does not, in itself, require that the evidence be suppressed for want of attenuation. *Wellins*, 654 F.2d at 555.

Not all cases will present a significant hiatus between the illegality and a consensual search or confession which clearly points to attenuation of the prior illegality. *Cf. Wong Sun*, 371 U.S. at 491, 83 S.Ct. at 419, 9 L.Ed.2d at 457 ("several days"); *Ravine*, 11 M.J. at 330 (50 days). Most cases will present a scenario such as this one, a sequence of fairly rapidly moving events. Consequently, the temporal proximity factor requires a *qualitative* analysis rather than merely counting the minutes, hours, or days. *Taylor v. Alabama*, 457 U.S. at 691, 102 S.Ct. at 2667, 73 L.Ed.2d at 320 (six hours elapsed between illegal arrest and confession, but time was full of continuous interrogation and a lineup); *Rawlings v. Kentucky*, 448 U.S. at 108, 100 S.Ct. at 2563, 65 L.Ed.2d at 644 (Rawlings and others detained in apartment for 45 minutes under custodial conditions, but atmosphere was congenial); *Fazio*, 914 F.2d at 958 (1 hour; Fazio not in custody and cooperative throughout); *United States v. Edmondson*, 791 F.2d 1512, 1516 (11th Cir. 1986) (confession at station 45 minutes after illegal arrest attenuated); *see also Dunaway v. New York*, 442 U.S. at 220, 99 S.Ct. at 2260–61, 60 L.Ed.2d at 841 (Stevens, J., concurring) (temporal relationship between arrest and confession may be an ambiguous factor).

The 15 minutes in question were not a vacuum. The military judge, however, did not include in his findings the conversation between appellee and SA D while *en route* to appellee's residence, and we are not at liberty to find additional facts. *Pacheco*, 36 M.J. at 533. Nonetheless, the military judge found as fact that the tin and straw were not referred to or shown to appellee for the remainder of the evening. Therefore, although the temporal proximity between the illegality and the consent to search was brief, there was no exploitation of the illegality

during that period. *See Edmondson,* 791 F.2d 1512; *cf. Phillips,* 32 M.J. at 81.

We next assess intervening circumstances which may have occurred between the illegality and appellee's giving his consent to search, and we find none. After the discovery of the cocaine in the tin, he was in the continuous presence of SAs D and M. No other significant investigative events occurred apart from the events transpiring between appellee and the agents. This is not fatal to the analysis. A review of the applicable precedents teaches that intervening circumstances or events are most frequently looked to as corroboration of an apparent attenuated exercise of free will by a suspect after the Fourth Amendment violation in question. *See Ravine,* 11 M.J. at 331; *Wellins,* 654 F.2d at 556. In the absence of corroborative intervening circumstances, any act of free will must be viewed on its own merit in light of the prior illegality.

The final *Brown* factor relevant to our assessment is the purpose and flagrancy of the official misconduct in question. Among the four unequally weighed factors, this one may well be the most crucial, because it is tied to the rationale for the exclusionary rule itself. *See Taylor v. Alabama,* 457 U.S. at 690, 102 S.Ct. at 2667, 73 L.Ed.2d at 319; *Dunaway v. New York,* 442 U.S. at 219, 99 S.Ct. at 2260; *Dunaway v. New York,* 442 U.S. at 226, 99 S.Ct. 2264 (Rehnquist, J., dissenting); *Brown,* 422 U.S. at 604, 95 S.Ct. at 2262, 45 L.Ed.2d at 428; *United States v. Davis,* 30 M.J. 718 (A.F.C.M.R.1990); *Fazio,* 914 F.2d at 958. In the case *sub judice,* the facts show the purpose and flagrancy of the illegal search to be *de minimis.*

First, SAs M and D had not launched on a fishing expedition hoping something would turn up. *Cf. Dunaway v. New York,* 442 U.S. at 218, 99 S.Ct. at 2248, 60 L.Ed.2d at 840; *Brown,* 422 U.S. at 605, 95 S.Ct. at 2262, 45 L.Ed.2d at 428; *Recalde,* 761 F.2d at 1459. They had information from appellee's roommate that he was involved in illicit drug activity and he had gone to New York city to obtain cocaine. Second, until his use of the preamble, SA M had conducted his investigation of appellee well within constitu-

tional requirements. When he searched appellee's residence pursuant to his roommate's consent, he searched only the common areas and the trash. Appellee was not seized at the bar, but voluntarily accompanied the agents outside to the parking lot. The agents did not display weapons [5] or otherwise threaten force. As noted in Part IV–A, *supra,* it was a sudden move by appellee which caused SA D to grab his wrist. Given these circumstances, SAs D's and M's actions in the form of the preamble and illegally opening the tin were not egregious acts. The *de minimis* quality of these illegalities notwithstanding, were they the motivating factor behind appellee consenting to the search? The facts firmly support an answer of no.

The military judge found appellee fully understood his rights and voluntarily executed the consent to search form after objecting to the word, "distribution." We take note that appellee's "objection" was emphatic. SA M related it as follows:

> I wanted to cover all my bases [on the form] so to speak in case we found out he had distributed cocaine. He said, no, *I will not sign that with distribution on there.* He said, I've never sold cocaine. I will not sign that. I explained to him that this is just what we are investigating, it doesn't mean that he's guilty of that. He still said, I will not sign that. So, I said, will you have any problems if I mark out the distribution? He said, I will agree to it then.

(Emphasis added) This exchange does not reflect a person who was intimidated by SA M saying "we and other agencies are on to you," or one laboring under the shadow and impact of the prior discovery of the cocaine in the tin. Although appellee claims he signed the form out of fear, his objective acts belie this claim. A suspect's objective acts outweigh claims of fear or intimidation, even when in custody. *See United States v. Burns,* 33 M.J. 316 (C.M.A.1991). Further, the military judge found that appellee knowingly cooperated in the seizure of all of the

---

5. The record is silent as to whether the agents were in fact armed.

evidence in question,[6] which is inconsistent with mere acquiescence to authority. *See Burns,* 33 M.J. at 320; *Fazio,* 914 F.2d at 955–958.

In view of the *de minimis* Article 31(b) and Fourth Amendment violations in issue, and the absence of exploitation of the results of those illegalities, the totality of all the circumstances support a finding that appellee's consent to search was an act of independent free will sufficient to attenuate the prior illegalities. *Wong Sun,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441; *United States v. Carson,* 793 F.2d 1141, 1159 (10th Cir.1986) (Logan, J., concurring), *cert. denied,* 479 U.S. 914, 107 S.Ct. 315, 93 L.Ed.2d 289 (1986); *Edmondson,* 791 F.2d at 1516.

The same conclusion holds for appellee's subsequent confession at the OSI office. As noted in Part IV–C, *supra,* appellee was aware of his rights and asserted them at his discretion. The internal tension and nausea he experienced was due to his realization of his plight, and not to any illegal actions by SA D or M. The record reflects appellee acquiesced to his circumstances rather than to authority. Both consents to search and his confession were knowing and voluntary. *Goudy,* 32 M.J. at 92; *Burns,* 33 M.J. at 320.

## V. DECRETAL

Accordingly, the ruling of the military judge suppressing the results of the consensual searches and appellee's confession is hereby reversed. The record is returned to the convening authority.

Senior Judge RAICHLE and Judge YOUNG concur.

---

**6.** This is somewhat of an understatement. Without appellee's cooperation and participation in the search, it is doubtful just how much cocaine would have been found and seized. Even the drug dog was ineffective. SAs M and D seized only that cocaine shown them by appellee. During the subsequent interview at the office, appellee had to tell SA M that some of the cocaine referred to in his confession was not the cocaine taken from the laundry hamper. There was additional cocaine still in the bottom of the hamper. SA M did not bother to search further after finding a bag of cocaine appellee told him was therein. He and appellee returned to the residence after the interview and seized the remainder from the hamper.